UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, | ) | |
| ALLSTATE FIRE AND CASUALTY INSURANCE | ) | C.A. No. _____ |
| COMPANY, ALLSTATE PROPERTY AND | ) | |
| CASUALTY INSURANCE COMPANY, | ) | |
| ALLSTATE INDEMNITY COMPANY, AND | ) | |
| ALLSTATE VEHICLE AND PROPERTY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiffs, | ) | **Demand for Jury Trial** |
| | ) | |
| v. | ) | |
| | ) | |
| G&U ORTHOPEDIC, LLC, | ) | |
| SUMMERLIN MEDICAL L.L.C., | ) | |
| FLEXUS MEDICAL LLC, EASTERN DME, INC., | ) | |
| GUSTAVO URBINA, STACIE GREENSPAN, | ) | |
| JOANNY URBINA, AND | ) | |
| MERLE BARBARA GONZALEZ, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Vehicle and Property Insurance Company (hereinafter collectively referred to as "Allstate" and/or "Plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink P.C., hereby allege as follows:

### I.    <u>INTRODUCTION</u>

1.    Gustavo Urbina ("Urbina"), and his coconspirators, Stacie Greenspan ("Greenspan"), Joanny Urbina Gonzalez ("Joanny"), and Merle Barbara Gonzalez ("Gonzalez") by and through the operation of their businesses, G&U Orthopedic, LLC ("GUO"), Summerlin

Medical L.L.C. ("Summerlin"), Flexus Medical LLC ("Flexus"), Eastern DME, Inc. ("Eastern") (hereinafter collectively referred to as the "Defendants"), devised and executed a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent records, and bills for the sale and distribution of durable medical equipment ("DME") and supplies, and related services through the U.S. Mail seeking to collect payment from Allstate.[1]

2.      The Defendants targeted the insurance benefits available to motor vehicle accident victims (also referred to herein as "Allstate claimants") to ensure a steady stream of revenue to support their fraudulent scheme.

3.      The scheme, illustrated below, was intentionally initiated, promoted, financed, operated and/or maintained by the Defendants.

4.      The Defendants are aware that their scheme is unfair and deceptive to payors of healthcare goods and services, such as Allstate.

5.      The Defendants' defrauded Allstate by:

    a.   Billing for the distribution, delivery, education, and fitting of DME products to Allstate claimants when Summerlin, Flexus, and Eastern were unlicensed in violation of applicable state law.

    b.   Billing for DME supplies and services that were not provided to Allstate claimants.

    c.   Billing for DME products based upon false representations to Allstate that the DME was prescribed by a licensed and/or qualified healthcare professional.

    d.   Billing for replenishing DME supplies and related services to Allstate claimants that were not prescribed by a physician or other qualified healthcare provider, and therefore medically unnecessary.

---

[1] Eastern, GUO, Summerlin, and Flexus, collectively shall be referred to as the "DME Entity Defendants."

    e.   Unilaterally making the medical decision to replenish Allstate claimants' DME supplies when the Defendants are not licensed medical practitioners.

    f.   Billing for DME that was not medically necessary to the Allstate claimants.

    g.   Billing for duplicative set-up and delivery charges for DME dispensed by the referring provider.

    h.   Billing grossly excessive fees for DME supplies and rental services.

6.    The Defendants' conduct constitutes an intentional violation of Illinois and Wisconsin laws and regulations governing medical decision-making, and the sale and distribution of DME.

7.    Allstate justifiably and detrimentally relied upon the Defendants' false documentation in evaluating insurance claims.

8.    The Defendants intended to siphon payments from the proceeds of the insurance monies paid by Allstate to resolve the claimants' medical expense and bodily-injury claims.

9.    The Defendants mailed false documents directly to Allstate.

10.    The Defendants mailed false documents to Allstate claimants or their personal injury attorneys who, in turn, mailed the documents to Allstate in support of the Allstate claimants' medical expense and bodily-injury claims.

11.    The Defendants knew that Allstate would rely on the representations made in the Defendants' records and bills when determining whether to pay medical expenses and bodily-injury claims.

12.     In Illinois, the Defendants secured payment for their services by asserting healthcare liens under 770 ILCS 23/10, which purportedly gave GUO, Summerlin, and Flexus the right to be paid from settlements, judgments, or awards obtained by the Allstate claimants.

13.     Allstate made payments to the Defendants, and Allstate was also caused to make payments in connection with bodily-injury claims presented by the Allstate claimants, which collectively total more than **$564,613.93** (the exact amount to be determined at trial)

14.     Allstate made payments on these claims in direct reliance on the false records and bills created by the Defendants.

15.     In all cases, Allstate reasonably relied upon the Defendants' misrepresentations and omissions of material fact concerning (a) the licensure of the DME distribution businesses, (b) the licensure and training of its technicians; (c) the medical necessity of the services, and (c) that the services and supplies were, indeed, distributed and administered, respectively.

16.     By its pleading, Allstate brings this action against the Defendants seeking damages for violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962, and under Illinois and Wisconsin state laws.

17.     By its pleading, Allstate brings this action against the Illinois-based Defendants pursuant to (a) violations of 720 ILCS 5/17-10.5 (Insurance Claims Fraud Provention Act), (b) violations of  815 ILCS 505/2 (Consumer Fraud and Decpetive Business Practices Act), (c) common law fraud, and (d) unjust enrichment.[2]

---

[2] The Illinois Defendants shall refer to GUO, Summerlin, Flexus, Urbina, Greenspan, Joanny, and Gonzalez.

18.     By its pleading, Allstate brings this action against the Wisconsin based Defendants pursuant to (a) violations of Wis. Stat. § 946.83 (Wisconsin Organized Crime Control Act), (b) violations of the Fraudulent Insurance Claims criminal statute (Wis. Stat § 943.395) pursuant to Wis. Stat. § 895.446, (c) common law fraud and misrepresentation, and (d) unjust enrichment.[3]

19.     Allstate also seeks an order declaring that Allstate has no obligation to pay GUO, Summerlin, Flexus, or Eastern for any of the services at issue in this Complaint.

20.     Allstate also seeks an award of (a) double damages, treble damages, and punitive damages as authorized by law, (b) statutory interest, (c) costs, and (d) attorneys' fees.

**II.     THE PARTIES**

**A.     PLAINTIFFS**

21.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Vehicle and Property Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

22.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Vehicle and Property Insurance Company have their respective principal places of business in Northbrook, Illinois.

23.     At all times relevant to the allegations contained in this Complaint, the Plaintiffs were authorized to conduct business in the State of Illinois and the State of Wisconsin.

---

[3] The Wisconsin Defendants shall refer to Eastern, Urbina, and Joanny.

B.    **DEFENDANTS**

    1.    **G&U Orthopedic, LLC**

24.    GUO's principal place of business is located at 3531 W. Fullerton Avenue, Chicago, IL 60647.

25.    GUO is a corporation organized under the laws of the State of Illinois.

26.    GUO is a DME distribution business that primarily services customers/claimants in the State of Illinois.

27.    GUO was formed on or around September 19, 2008 by its owners and managers, Urbina and Greenspan.

28.    Urbina recruited medical providers to refer patients' prescriptions to GUO.

29.    On information and belief, Urbina would recruit medical providers and their staff to act as agents for the sale of his DME products.

30.    Greenspan was responsible for generating the billing for GUO submitted to Allstate for the DME and services.

31.    In or around January 1, 2017, Urbina and Greenspan executed an "Operating Agreement" for GUO, which memorialized the material aspects of how Urbina and Greenspan had already been operating GUO since 2008. The "Operating Agreement" is governed by Illinois law.

32.    Under the "Operating Agreement," Urbina and Greenspan were the company's initial two managers, both with full and equal control over the business operations.

33.    The "Operating Agreement" was amended in or about 2018, whereby Joanny and Gonzalez became members, owners, and managers of GUO.

34.     Although GUO is no longer distributing DME, GUO continues to seek compensation for the purported distribution of DME.

35.     GUO is owned and controlled by the Defendants, Urbina, Greenspan, Joanny, and Gonzalez. The Defendants, Urbina, Greenspan, Joanny, and Gonzalez are responsible for all actions and conduct of GUO.

36.     As set out below, GUO billed for DME (1) not dispensed to Allstate claimants; (2) based on unlawful prescriptions (or no prescriptions at all); (3) for unnecessary DME provided pursuant to a predetermined treatment protocol; and (4) at grossly excessive charges.

37.     The Defendants, Urbina, Greenspan, Joanny, Gonzalez, Summerlin, Flexus, and Eastern participated in the affairs of the GUO enterprise.

### 2.     Summerlin Medical L.L.C.

38.     Summerlin is a corporation organized under the laws of the State of Nevada.

39.     Summerlin is registered in Illinois as a foreign corporation.

40.     Summerlin's principal place of business in Illinois is located at 3531 W. Fullerton Avenue, Chicago, IL 60647, which is the same principal address that GUO uses.

41.     Summerlin's principal place of business is listed as 10300 W. Charlestown Blvd., Suite 13, Las Vegas, Nevada, 89135.  This is the address of a UPS store, and Suite 13 is, in fact, a mailbox number.

42.     Summerlin does not have a physical address in the State of Nevada.

43.     Summerlin is a DME distribution business that primarily services customers/claimants in the State of Illinois.

44.     Summerlin was formed sometime in 2018.

45. In regard to Summerlin and GUO's operational overlap, Urbina testified in the following manner.

> 17 Q Did G&U Orthopedic become Summerlin
> 18 Orthopedic or Summerlin Medical Durable Equipment?
> 19 A Yes.

46. Summerlin assumed the DME operations of GUO.

```
13      A.  So G & U is active, but it stopped
14 operating towards the end of 2019, and that
15 is the reason why Summerlin Medical was
16 started -- was started as a corporation, as a
17 company in the beginning of 2020.
18           It operates out of the same
19 facility.  Summerlin covers the same facility
20 to cover clients, operations and staff as
21 well.
22      Q.  Okay.  And so when you started
23 Summerlin after G & U stopped its active
24 business, did you just transport all staff
                                          Page 25
1 over to Summerlin from G & U?
2      A.  That is the intention, yes.
3      Q.  And what was the reason that G & U
4 stopped -- I am Sorry.  Go ahead.
5      A.  No, I was going to say that yeah,
6 all the staff from G & U is transferred to --
7 yes, Summerlin Medical.
8      Q.  Okay.  And what was the reason that
9 G & U stopped its kind of active day-to-day
10 operations in 2019?
11      A.  It was a personal decision among
12 the owners.
13      Q.  Personal --
```

47. On behalf of Summerlin, Urbina continued to recruit medical providers and their staff to act as agents for the sales of his DME products.

48. Greenspan was responsible for generating Summerlin's billing submitted to Allstate for the DME, and collections.

49. Although Summerlin is no longer actively distributing DME in Illinois, it is still actively trying to collect payment from Allstate for services that it purportedly provided to Allstate claimants.

50. Summerlin was managed, owned and/or controlled by the Defendants, Urbina, Joanny, Greenspan, and Gonzalez. As such, Urbina, Greenspan, Joanny, and Gonzalez are responsible for all the actions of Summerlin described in this Complaint.

51. As set out below, Summerlin billed (1) for the unlicensed dispensing of DME; (2) for DME not dispensed to Allstate claimants; (3) based on unlawful prescriptions (or no prescriptions at all); (4) for unnecessary DME provided pursuant to a predetermined treatment protocol; and (5) at grossly excessive charges.

52. The Defendants, Urbina, Greenspan, Joanny, Gonzalez, GUO, Flexus, and Eastern, participated in the affairs of the Summerlin enterprise.

### 3. Flexus Medical LLC

53. Flexus is a limited liability company organized under the laws of the State of Florida law.

54. Flexus was formed in December of 2021.

55. Flexus' principal place of business is located at 6532 Via Rosa, Boca Raton, FL 33433.

56. On information and belief, Flexus is not registered in Illinois as a foreign corporation but may still conduct business and enter into contracts.

57.     Flexus operates its business in Illinois at the following location: 3531 W. Fullerton Avenue, Chicago, IL 60647, which is the same as the principal address for GUO and Summerlin.

58.     Flexus is a DME distribution business that primarily services customers/claimants in the State of Illinois.

59.     The Defendants, Urbina and Joanny own and control Flexus.  As such, Urbina and Joanny are responsible for all the actions of Flexus described henceforth in this Complaint.

60.     As set out below, Flexus billed (1) for the unlicensed dispensing of DME; (2) for DME not dispensed to Allstate claimants; (3) based on unlawful prescriptions (or no prescriptions at all); (4) for unnecessary DME provided pursuant to a predetermined treatment protocol; and (5) at grossly excessive charges.

61.     The Defendants, Urbina, Joanny, Gonzalez, GUO, Summerlin, and Eastern participated in the affairs of the Flexus enterprise.

### 4.     Eastern DME, Inc.

62.     Eastern is a corporation organized under the laws of the State of Wisconsin.

63.     Eastern is a DME distribution business that primarily services customers/claimants in the State of Wisconsin.

64.     Eastern was formed in or about 2012.

65.     On information and belief, Eastern also conducts business in the state of Minnesota.

66.     Eastern's principal place of business is listed as 6508 S. 27th Street Oak Creek, WI 53154, which is the location of a UPS store.

67.     Eastern does not have a physical address in Wisconsin or Minnesota.

68.     On information and belief, Eastern performs billing services and maintains its inventory at 3531 W. Fullerton Avenue, Chicago, IL 60647.

69.     As set out below, Eastern billed (1) for the unlicensed dispensing of DME; (2) for DME not dispensed to Allstate claimants; (3) based on unlawful prescriptions (or no prescriptions at all); (4) for unnecessary DME provided pursuant to a predetermined treatment protocol; and (5) at grossly excessive charges.

70.     The Defendants, Urbina and Joanny own and control Eastern.  As such, Urbina and Joanny are responsible for all the actions of Eastern described in this Complaint.

71.     The Defendants, Urbina, Joanny, GUO, Summerlin, and Flexus participated in the affairs of the Eastern enterprise.

### 5.      Gustavo Urbina

72.     Urbina is a resident and citizen of the State of Florida.

73.     Urbina is not licensed in any healing art.

74.     At all times relevant to this Complaint, Urbina owned and controlled GUO, Summerlin, Flexus, and Eastern.

75.     Due to his control over GUO, Summerlin, Flexus and Eastern, Urbina is responsible for the damages caused by GUO, Summerlin, Flexus, and Eastern's fraudulent billing for DME, supplies, and related services in connection with Allstate claimants.

### 6.      Stacie Greenspan

76.     Greenspan is a resident and citizen of the State of Tennessee.

77.     Greenspan is not licensed in any healing art.

78.     In 2022, Greenspan filed a lawsuit against Urbina, Joanny, Gonzalez, Flexus and Eastern on behalf of herself, and GUO and Summerlin, derivatively.

79.     Greenspan alleged that Urbina, Joanny and Gonzalez were engaged in a conspiracy and committed fraud, by syphoning resources from GUO and Summerlin, such as referral sources, customers and assets, to both Flexus (in Illinois) and Eastern (in Wisconsin).

80.     At all times relevant to this Complaint, Greenspan owned and participated in the operation and management of the GUO and Summerlin businesses.

81.     Greenspan is therefore responsible for the damages caused by GUO and Summerlin's fraudulent billing for DME, and related services and supplies in connection with Allstate claimants.

### 7.    **Joanny Urbina**

82.     Joanny is a resident and citizen of the State of Florida.

83.     Joanny is not licensed in any healing art.

84.     At all times relevant to this Complaint, Joanny owned and controlled GUO, Flexus and Eastern.

85.     Joanny also participated in the operation and management of GUO, Summerlin, Flexus and Eastern.

86.     Joanny is therefore responsible for the damages caused by GUO, Summerlin, Flexus, and Eastern's fraudulent billing for DME, and related services and supplies in connection with Allstate Claimants.

### 8.    **Merle Barbara Gonzalez**

87.     Gonzalez is a resident and citizen of the State of Florida

88.     Gonzalez is not licensed in any healing art.

89.     At all times relevant to this Complaint, Gonzalez owned and controlled Summerlin.

90.     Gonzalez also participated in the operation and management of GUO, Summerlin, and Flexus.

91.     Gonzalez is, therefore, responsible for the damages caused by GUO, Summerlin, and Flexus' billing for DME, and related services and supplies in connection with Allstate claimants.

## III.    JURISDICTION AND VENUE

92.     Jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

93.     Supplemental jurisdiction over the Plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1967.

94.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the majority of the acts at issue in this Complaint were carried out within the Northern District of Illinois.

## IV.    APPLICABLE LAW

### A.    ILLINOIS HOME MEDICAL EQUIPMENT AND SERVICES PROVIDER LICENSE ACT (225 ILCS 51/10)

95.     Under the Illinois Home Medical Equipment and Services Provider License Act (225 ILCS 51/10), a provider that engages in home delivery of certain medical devices, including TENS units, must be licensed to do so.  225 ILCS 51/10(6)(F).

96.     In Illinois, in order to distribute DME to customers, Home Medical Equipment (HME) distributors must be licensed by the Department of Financial & Professional Regulation (IDFPR).

-13-

97. No entity shall provide or hold itself out as providing home medical equipment and services, or use the title "home medical equipment and services provider" in connection with his or her profession or business, without a license issued by the IDFPR. 225 ILCS 51/15(a).

98. Summerlin was not licensed with the Department of Financial and Professional Regulation.

99. During a portion of the relevant timeframe, Flexus was not licensed with the Department of Financial and Professional Regulation.

      **B.** **WISCONSIN HOME MEDICAL EQUIPMENT AND SERVICES PROVIDER LICENSE ACT WIS. STAT. § 450.01**

100. Under Wisconsin law, the practice of pharmacy includes the dispensing of DME. *See* Wis. Stat. § 450.01(16)(b).

101. "Dispensing" means delivering a prescribed drug or device to an ultimate user pursuant to the prescription order of a practitioner. *Id*. at (7).

102. A "device" means any machine used to treat disease or other conditions in patients. *Id*. at 6(b).

103. Eastern's dispensing of DME to Wisconsin claimants therefore constitutes the practice of pharmacy.

104. In Wisconsin**,** to distribute DME to customers, distributors must be licensed with the Wisconsin Department of Safety and Professional Services.

105. Eastern is not licensed with the Wisconsin Department of Safety and Professional Services.

## C.     ILLINOIS INSURANCE FRAUD STATUTE

106.     A person commits insurance fraud in violation of Illinois law when they use deception to obtain the property of an insurance company (i.e., money) by making a false claim, with the intent to permanently deprive the insurance company of the use and benefit of that property.  *See* 720 ILCS 5/17-10.5(a)(1).

107.     A "false claim" is one that "conceals (i) the occurrence of an event that is material to any person's initial or continued right or entitlement to any insurance benefit or payment or (ii) the amount of any benefit or payment to which the person is entitled."  720 ILCS 5/17-0.5.

108.     A "false claim" also includes "any statement made to an insurer . . . made as part of, or in support of a claim for payment . . . and contains any false, incomplete, or misleading information concerning any fact or thing material to the claim."  *See Vertex Ref., NV, LLC v. Nat'l Union Fire Ins., Co. of Pittsburgh, PA*, 2017 U.S. Dist. LEXIS 107312, No. 16 CV 3498, at *8–9 (N.D. Ill. July 11, 2017) (Pallmeyer, D.J.).

109.     "Statement" is defined as any assertion—oral, written, or otherwise—and includes, but is not limited to, any notice, letter, invoice, bill for services, diagnosis or prognosis, medical record, or any other data in any form. 720 ILCS 5/17-0.5.

110.     A person who commits insurance fraud "shall be civilly liable to the insurance company . . . in an amount equal to either 3 times the value of the property wrongfully obtained or, if no property was wrongfully obtained, twice the value of the property attempted to be obtained . . . plus reasonable attorney's fees."  720 ILCS 5/17-10.5(e)(1).

### D. ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICE ACT - 815 ILCS 505

111.    A seller of merchandise and services commits a violation of the Consumer Fraud and Deceptive Business Practice Act ("Consumer Fraud Act") when they are deceptive by act or practice during the course of trade or commerce and do so with the intent that the consumer will rely on the deception. *See* 815 ILCS 505/1.

112.    "Consumer" means any person, including a company or business, who purchases or contracts for the purchase of merchandise in the ordinary course of his trade or business but for his use. *Id*.

113.    A seller in the medical field is liable under the Consumer Fraud Act for medical business activities unrelated to medical decision making and treatment. *Gadson v. Newman*, 807 F. Supp. 1412 (C.D. Ill. 1992).

114.    In describing various deceptive business conduct, the Consumer Fraud Act specifically provides that it is a deceptive trade practice when a seller "causes likelihood of confusion or a misunderstanding as to the… certification of goods and services."

115.    The act further provides it is an unlawful practice for the seller of the merchandise to periodically send and bill for shipments of similar merchandise, unless the consumer has agreed, by express request or consent, to receive such periodic shipments of merchandise.

116.    A consumer may recover both compensatory and punitive damages under this Act. *Black v. Lovino*, 219 Ill. App. 3d 378 (1991); *Check v. Clifford Chrysler Plymouth of Buffalo Grove, Inc.,* 342 Ill. App. 3d 150 (1st Dist. 2003).

-16-

117.     A consumer may also obtain an award for attorney's fees under the Act. 815 ILCS 505/10a; *Ekl v. Knecht*, 223 Ill. App. 3d 234 (1991); *Krautsack v. Anderson*, 329 Ill. App. 3d 666 (1st Dist. 2002).

### E.     WISCONSIN FRAUDULENT INSURANCE CLAIMS

118.     A person commits a Class A misdemeanor (if the value of the claim or benefit does not exceed $2,500) and a Class I felony (if the value of the claim or benefits exceeds $2,500) for insurance fraud in violation of Wisconsin law when they "[p]resent[] or cause[] to be presented a false or fraudulent claim, or any proof in support of such claim, to be paid under any contract or certificate of insurance." Wis. Stat. § 943.395.

119.     Wis. Stat. § 895.446(1) provides that a person, including a company or business, who suffers damage or loss by reason of intentional conduct prohibited by 943.395 may bring a civil action for damages.

120.     Pursuant to section 895.446(3), "[i]f the plaintiff prevails in such a civil action … he or she may recover all [of their] (a) Actual damages…, [and] (b) All costs of investigation and litigation that were reasonably incurred, including the value of the time spent by any employee or agent of the victim [and] (c) Exemplary damages of not more than 3 times the amount awarded under par. (a)."

121.     The purpose of exemplary damages is to punish the wrongdoer or deter the wrongdoer and others from engaging in similar conduct in the future.

122.     Significantly, a civil fraudulent insurance claim action does not depend on any parallel criminal action. Thus, Allstate is claiming the right to money damages instead of a criminal conviction and jail time.

## V.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.     IMPACT OF DEFENDANTS' SCHEME TO DEFRAUD ON ALLSTATE

123.     Allstate insures motor vehicles in the State of Illinois and the State of Wisconsin, and has been underwriting automobile insurance.

124.     Providers of healthcare goods and related services can bill Allstate directly under applicable policies of insurance.

125.     Providers of healthcare goods and related services also submit bills to Allstate in connection with bodily-injury claims by Allstate claimants.

126.     In bodily-injury cases, the healthcare provider is paid through a healthcare lien after resolution of the insurance claim.

127.     The Defendants falsely billed Allstate for DME and supplies, and related services, wherein the Defendants falsely represented to Allstate that the DME was medically necessary and prescribed by independent healthcare professionals hired and retained directly by its customers, in this case, the Allstate claimants.

128.     The Defendants fraudulently billed Allstate for DME services, wherein they falsely represented that DME was delivered to Allstate claimants by qualified healthcare professionals, who fitted the Allstate claimant with the applicable DME product, and also directed the Allstate claimants on the use of the applicable DME, explained the medical necessity and benefits of the applicable DME, and communicated the contraindications associated with the use of the DME.

129.     In reasonable reliance on the Defendants' material representations Allstate issued payments to or for the benefit of the Defendants.

### B.     STRUCTURE OF THE DEFENDANTS' SCHEME TO DEFRAUD

130.    The Defendants have participated in a scheme that was devised to exploit the medical expense and bodily-injury coverages available to their customers.

131.    Automobile accident victims were especially desirable customers because the Defendants knew they could secure payment for GUO, Summerlin, Flexus, and Eastern's fraudulent billing by asserting healthcare liens against the proceeds of their patients' injury claims.

132.    The Defendants perpetrated their scheme by giving the appearance that GUO, Summerlin, Flexus and Eastern are legitimate companies in the business of selling, and occasionally renting DME products to its customers.

133.    The Defendants' main goal is to bill for as much DME, supplies, and related services as possible, regardless of whether such DME, supplies, and services are provided, medically necessary, or lawful.

134.    The Defendants' goal was not to provide legitimate DME, services and care of patients, but rather collecting payment from Allstate.

135.    The Defendants fraudulently billed for DME, supplies, and services in connection with Allstate claimants.

136.    To facilitate their scheme, the Defendants induce medical providers to submit DME prescriptions for their patients directly to the Defendants.

137.    On information and belief, the Defendants compensate the medical providers for the prescription referrals.

138.    The Defendants misrepresent in their advertisements that they have "several convenient locations."

139.    The Defendants have only one physical location, which services Illinois and Wisconsin, Indiana, Minnesota, and other states.

140.    The Defendants convince medical providers that it will make the process of distributing DME to their patients simple and easy.

141.    The Defendants furnish the medical providers with pre-printed prescription forms titled "D.M.E. Prescription & Letter of Medical Necessity."

142.    By way of example, please see the sample form created by GUO:



143.    The pre-printed prescription form prompts the provider to attest automatically, without any medical support that "the device [being prescribed] is medically necessary" and should be used daily.

144.    The Defendants misrepresent in advertisements on their websites that their "technicians are screened and fully trained for best practices of [their] medical equipment."

145.    The Defendants' "technicians" are not licensed or trained in any healing art.

146.    Urbina testified that the "technicians" are trained by its vendors and internally.

13    Q    Okay.  So back in the time Summerlin
14 operated, these technicians that you use to go out to
15 the patient's house, what certifications, licensures,
16 if any, did they have?
17    A    They go through training from our vendors.
18 We also have an internal training program to make sure
19 our technicians know how to use the equipment, know as
20 well, how to explain it to the patient, and we also
21 train them with proper customer service to deal with
22 patients as well.
23    Q    Did they possess any industry certificates
24 or licensures at all or is it just internal training

*      *      *

2    A    Internal training.  There's no certification
3 for that --
4    Q    Did you keep or maintain a file of the
5 training or the qualifications of the technicians when
6 you operated Summerlin?
7    A    I don't think so.

147.    The Defendants do not maintain any training records.

148.    The "technicians" training lasted for approximately two hours.

149.    The vendors do not issue "technician" certificates at the completion of their training.

150.    The training rendered to the "technicians" by the Defendants is inadequate.

151.    The Defendants' "technicians" push customers to use DME products daily, regardless of the prescribing providers instructions, because patients that use the products daily will require additional supplies that the Defendants can bill.

152.    The Defendants' "technicians" are not medically qualified to decide that amount of time each individual Allstate claimants should use prescribed DME products.

153.    On information and belief, the Defendants' customers are not provided with any meaningful opportunity to shop or purchase the prescribed DME or related supplies from an alternative vendor, distributor, or pharmacy.

154.    The Defendants do not provide Allstate claimants with the price of the DME, supplies and services, before it is dispensed.

155.    The Allstate claimants are not informed that they could purchase the DME on their own at a significantly lower price.

156.    The Defendants do not inform Allstate claimants that they buy standard prepackaged DME equipment and supplies from online vendors, which they, in turn, sell to the Allstate claimants at a markup price that is 700-1800 % higher than the cost of the DME products in the marketplace.

157.    The Defendants then dispense the prepackaged DME equipment as-is to Allstate claimants without adding any value – there are no added supplies or an increased warranty.

158.    The equipment the Defendants dispense mostly consists of Transcutaneous Electrical Nerve Stimulation (TENS) units, which are home-portable electrical stimulation units that retail online for under $70.00.

159.    The Defendants purposefully do not identify the make or model of the DME in its records or bills for the sole purpose of obscuring the actual marketplace retail price, and the unconscionable markup.

160.    The Defendants then demand excessive payments for the DME and supplies.

## C.    THE DEFENDANTS' UNLAWFUL OPERATION OF DME BUSINESSES

161.    The Defendants routinely bill Allstate and its customers for DME products and supplies, and related services through Summerlin, Flexus, and Eastern.

162.    The Defendants operated Summerlin, Flexus, and Eastern without a license in violation of Illinois and Wisconsin law.

### Summerlin Medical

163.    Summerlin failed to possess the requisite licensure required under Illinois law.

164.    Urbina and Greenspan are fully aware of the licensure requirement because they had previously applied for an IDFPR license on behalf of GUO in April of 2010.

165.    In fact, in November of 2021, Urbina acknowledged that a license to distribute DME was required in Illinois.

```
12        Q.  Okay.  And then for you to operate,
13   is there a licensure requirement within
14   Illinois?
15        A.  Yes.
```

166.    Summerlin has never been licensed under 225 ILCS 51/10 or otherwise authorized to distribute DME/HME in the State of Illinois.

167.    On information and belief, Urbina and Greenspan did not obtain a license to distribute DME/HME to avoid being regulated by the IDFPR and/or to circumvent professional insurance requirements.

168.    In regard to Summerlin's licensure, Mr. Urbina testified in the following manner.

> 13    Q    So did Summerlin Medical ever actually
> 14    obtain a durable medical equipment license in the
> 15    state of Illinois while it operated?
> 16    A    No.

169.    Summerlin unlawfully distributed DME and supplies, and performed related services to Allstate claimants from 2019 - 2021.

170.    Summerlin regularly asserted healthcare liens pursuant to Illinois Health Care Services Lien Act 770 ILCS § 23/5 to secure payment for distribution of DME, supplies, and services to Allstate claimants.

171.    The Lien Act allows medical providers to assert a lien against "all claims and causes of action of the injured person" to secure future payment of the provider's "reasonable" charges.

172.    The Illinois Defendants made the misrepresentation that they were qualified medical providers under the Lien Act.

173.    The Lien Act does not apply to DME distributors.

174. Even if a DME distributor qualified as a medical provider under the Lien Act, because it was unlicensed, Summerlin was never eligible to assert healthcare liens to secure payment for distribution of DME, supplies, and services.

175. The Defendants routinely misrepresented that Summerlin was duly licensed on the face of its healthcare liens that it submitted to secure payment.



(Claim No. 0630643880)

176. In regard to Summerlin's business activities after December of 2021, Urbina testified to the following.

Page 11

```
 1     A    It does not have any operations.  We just
 2 have it open for the purpose of collecting receivables
 3 that are still outstanding.
 4     Q    So the company itself is not dissolved?
 5     A    No, it is not.
 6     Q    It's still incorporated in Nevada?
 7     A    Yes.
 8     Q    And you said it ceased operations.  When did
 9 it cease operations?
10     A    I believe it was December of 2021.
```

177.    In furtherance of the defendants' scheme to defraud, Summerlin is actively seeking collection for the unlawful distribution of DME, supplies, and services purportedly provided to Allstate claimants.

**Flexus Medical**

178.    Flexus did not have the requisite license pursuant to 225 ILCS 51/10, and, therefore, was unauthorized to distribute DME in the State of Illinois from December 2021 - March 2022.

179.    On information and belief, Urbina chose not to obtain a license to distribute DME/HME in Illinois to avoid being regulated by the IDFPR and/or to circumvent State professional insurance requirements.

180.    Flexus distributed DME and supplies, and allegedly performed services to Allstate claimants from December of 2021 to March of 2022, which was in violation of the licensure law.

181.    Flexus unlawfully asserted healthcare liens to secure payment for distribution of DME, supplies, and services it purportedly rendered to Allstate claimants between December 2021 – present, because Flexus is not a qualified medical professional under the Lien Act, and, therefore,

it is ineligible to assert healthcare liens pursuant to the Act to secure payment for distribution of DME, supplies and services.

182.     Regardless, the Defendants routinely misrepresented that Flexus was duly licensed between December 2021 - March 2022 on healthcare liens that it submitted to secure payment.



(Claim No. 0653652354).

183.     Flexus also represented that it was subject to the DME supplier standards contained in 42 Code of Federal Regulations 424.57

184.     By stating that it was subject to 42 Federal Regulations 424.57, Flexus and its ownership misrepresented to Allstate and others, including prescribing providers, that it was accredited with the Centers for Medicare & Medicaid Services.

185.    None of the named DME entities are accredited.

186.    In order to meet the accreditation requirements to bill Medicare, Summerlin, Flexus, and Eastern would need to meet Illinois licensing requirements.

187.    The false representation of accreditation was for the sole purpose of bolstering the companies' unmerited appearance of legitimacy.

188.    Flexus unlawfully distributed DME, and actively seeks to collect payment from Allstate for the distributed DME, supplies, and services that it purportedly rendered to Allstate claimants between December 2021 - March 2022, when it was not licensed.

**Eastern DME**

189.    To be accredited by the Centers for Medicare and Medicaid Services, a DME supplier must maintain a physical facility on an appropriate site and must maintain a visible sign with posted hours of operation. The location must be accessible to the public and staffed during posted hours of business. The location must be at least 200 square feet and contain space for storing records.

190.    Eastern does not maintain a physical location.

191.    None of the DME Entity Defendants maintain records concerning the purchase of DME equipment from vendors. Once the vendor is paid, usually within 30 days, the records are purposefully destroyed.

192.    Under Wisconsin law, the practice of pharmacy includes the dispensing of DME.

193.    "Dispensing" is defined as a means for delivering a prescribed drug or a medical device to an ultimate user pursuant to the prescription order of a practitioner. Wis. Stat. 450.01 (7).

194.     Eastern is not a licensed pharmacy and does not employ a licensed pharmacist or any other licensed medical practitioner authorized to distribute DME in the State of Wisconsin.

195.     Eastern has unlawfully distributed DME to Allstate claimants since 2012.

196.     Eastern and its ownership are actively distributing DME to Allstate claimants, and actively attempting to collect payment for the purported distribution of DME and supplies, and related services from Allstate, which it is not entitled to receive.

### D.     THE DEFENDANTS SUBMIT FRAUDULENT RECORDS AND BILLS

197.     The Defendants submit bills to Allstate seeking payment for DME, supplies, and services that were not provided.

198.     GUO, Summerlin, Flexus, and Eastern all utilized the Healthcare Common Procedure Coding System (HCPCS) - a numeric coding system recognized by the Centers of Medicare and Medicaid Services to address non-office physician services, such as DME distribution, when submitting its bills.

199.     The Defendants regularly submitted bills to Allstate seeking payment for DME, supplies, and services that were not rendered to patients as represented in the Defendants' invoices and records.

#### 1.     *The Defendants Bill for Services That Were Not Performed as Represented*

200.     Once GUO, Summerlin, Flexus, and Eastern received a DME prescription from a medical provider, a "patient coordinator" employed by the Defendants would contact the Allstate claimant directly to schedule a delivery.

201. The DME Entity Defendants then dispatch their respective "technicians" to the Allstate claimants' homes.

202. The "technicians" purportedly deliver the DME to the patient; instruct the patient how to use the DME; explain the possible contraindications associated with the DME; fit the patient with the DME; and answer any questions the claimant may have.

203. There are no substantial "fitting" adjustments to be made to the TENS units to tailor them to a patient's body. The documentation provided with the equipment to users is devoid of reference to a need for any "fitting" of the TENS units.

204. The Defendants have represented that their "technicians" will either deliver DME products or dispense the product on site.

205. The DME Entity Defendants bill $150.00-$250.00 pursuant to HCPCS A9901 for delivery and set up by the "technician."

206. By utilizing HCPCS A9901, the DME Entity Defendants represent that its "technician" delivered and set up DME for its customer and dispensed a "service" component.

207. In the event that Allstate claimants are not home to receive the delivery, the DME is simply left at the patient's front door, and Allstate is still billed $150.00-$250.00 for a service.

208. In the event the "patient coordinator" is not able to schedule a delivery with an Allstate claimant, the DME is either shipped to the Allstate claimant's home or left at their front door, and in that case, the DME Entity Defendants still bill $150.00-$250.00 for a service that they did not provide.

209. The DME Entity Defendants also distribute DME directly at referring healthcare providers' offices.

-30-

210. The Defendants apparently co-opt offices of the healthcare providers that will ultimately prescribe the DME to their patients, to store the DME products.

211. In these cases, rather than have its "technicians" deliver DME, an unidentified member of the prescribing healthcare providers' staff dispenses the DME directly to Allstate claimants at the healthcare provider's office, and then trains the Allstate claimant in the proper use of the DME, and the associated contraindications inherent with its use.

212. When this occurs, the healthcare providers bill Allstate for the services rendered to Allstate claimants.

213. In addition, the DME Entity Defendants bill Allstate $150.00 - $250.00 for the same services reportedly performed by the healthcare providers and/or their staff misrepresenting that Defendants' "technicians" trained the Allstate claimants in the proper use of the DME, and the associated contraindications inherent in its use.

214. To obscure the fact that the Defendants co-opted the prescribing healthcare providers to be agents of the Defendants, the bills submitted by the DME Entity Defendants report that a "technician" employed by the Defendants was the rendering provider.

## 2. *The Defendants Bill for Products That Were Not Distributed as Represented*

215. The Defendants bill for TENS units dispensed to Allstate claimants.

216. The Defendants purchased Twin Stim IV TENS units from a manufacturer or supplier, in bulk.

217. The Twin Stim IV units are available to the general public online at retail websites for under $70.00.

218.    When submitting invoices, the Defendants billed Allstate for the Twin Stim IV package by using HCPCS E0720 or HCPCS E0745.

219.    HCPCS E0720 is described as a "[t]ranscutaneous electrical nerve stimulation (TENS) device, two lead, localized stimulation."

220.    In the example below, Summerlin billed Allstate $682.08 pursuant to HCPCS E0720 for the Twin Stim IV.



221.    HCPCS E0745 is described as a "[n]euromuscular stimulator, shock unit [("NMES)]."

222.    In the example below, GUO billed pursuant to HCPCS E0745 at $1,311.64 for an identical Twin Stim IV unit.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 10172019 | 10172019 | 12 | E0745 | NU | | AB | 1311 64 | 1 | NPI | 1275826984 |
| 10172019 | 10172019 | 12 | A4556 | | | A | 17 31 | 1 | NPI | 1275826984 |
| ADAPTER | | | | | | | | | | |
| 10172019 | 10172019 | 12 | A9900 | | | A | 10 64 | 1 | NPI | 1275826984 |
| 10172019 | 10172019 | 12 | A4557 | | | A | 24 50 | 1 | NPI | 1275826984 |
| 10172019 | 10172019 | 12 | A4557 | | | A | 24 50 | 1 | NPI | 1275826984 |
| 10172019 | 10172019 | 12 | A9901 | | | AB | 150 00 | 1 | NPI | 1275826984 |

| 25. FEDERAL TAX I.D. NUMBER | SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|---|
| | ☐ ☒ | 21114 | ☒ YES ☐ NO | $ 1538 59 | $ 0 00 | |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) | 32. SERVICE FACILITY LOCATION INFORMATION | 33. BILLING PROVIDER INFO & PH # (866) 540 5365 |
|---|---|---|
| G&U ORTHOPEDIC | G&U ORTHOPEDIC - 001 106 W. CALENDAR AVE. | G&U ORTHOPEDIC 106 W. CALENDAR AVE #127 |

223.    Pursuant to the Twin Stim IV operators' manual, the unit is designed for the application of either TENS or NMES DME and services that can be set by the user.

224.    Pursuant to the Twin Stim IV operators' manual, NMES is designed for restorative condition and muscle strengthening.

225.    Pursuant to the Twin Stim IV operators' manual, TENS is primarily used for temporary pain relief.

226.    The prescribing medical providers never prescribed specific NMES units for Allstate claimants.

227.    The prescribing medical providers prescribed TENS units for Allstate claimants.

228.    The Defendants do not provide any written support for their unilateral choice to bill Allstate claimants for the Twin Stim IV package under an NMES code (HCPCS E0745) rather than under a TENS code (HCPCS E0720).

229.    On information and belief, the Defendants use the different HCPCS codes (E0720, and E0745), interchangeably, to create the illusion that it distributes different types of units to Allstate claimants.

230.    The Defendants use HCPCS E0745 to charge more, without increasing any value to Allstate's claimants.

231.    To maximize their fraudulent billing, the Defendants bill for additional supplies that are already included in the Twin Stim IV package.

232.    The Twin Stim IV package issued to Allstate claimants by the DME Entity Defendants comes equipped with the following product features:



(Roscoe Medical, 2015, InTENSity Twin Stim IV Manual, p.13).

233. Despite the fact that the Twin Stim IV package comes equipped with the supplies necessary to operate it immediately, the Defendants routinely billed Allstate for additional supplies that were not prescribed or shipped.

234. The Defendants routinely billed approximately $49.60 for "[l]ead wires" using code HCPCS A4557.

235. On information and belief, the Defendants did not supply Allstate claimants with additional lead wires when it delivered the Twin Stim IV Package.

236. Even if they did, the additional leads wires were not medically necessary and duplicative.

237. The Defendants routinely billed approximately $17.31 for an additional pack of "[e]lectrodes" using HCPCS A4556.

238. On information and belief, the Defendants did not supply additional electrodes when they delivered the Twin Stim IV Package.

239. Even if they did, the additional electrodes were not medically necessary and duplicative.

240. The Defendants also routinely billed approximately $10.64 for the additional wall and USB charger using HCPCS A9900.

241. On information and belief, the Defendants did not supply an additional wall and USB charger when it delivered Twin Stim IV Packages to Allstate claimants.

242. Even if they did, the additional wall and USB chargers were not medically necessary and duplicative.

243.    The Defendants billed for a predetermined second shipment of replacement supplies of disposable electrodes, lead wires, and batteries (without the recommendation of a healthcare provider) shortly after the Twin Stim IV packages are delivered, which is reflected in the exemplar bill below.



244.    The Defendants, however, never actually delivered the replacement supplies to the Allstate claimants.

245.    The Defendants' goal was to bill as much as they could regardless of whether the supplies were medically necessary, prescribed, or delivered.

### 3.    *The Defendants Bill for Supplies and Services That Were Not Medically Necessary*

246.    The Defendants billed for replenishment supplies that were purportedly shipped to Allstate claimants without any specific request or statement of need from the healthcare providers or Allstate claimants.

247. Pursuant to the Twin Stim IV's operators' manual, if a user's "pain does not improve, becomes seriously chronic or severe, or continues for more than five days, [the user should] stop using the device and consult with [their] physician." *Id.* at p. 8.

248. The Defendants failed to determine, by communicating with the Allstate claimants, whether the patient consulted with their physicians before shipping out replacement supplies.

249. The Defendants failed to determine, by communicating with the Allstate claimants, whether the patient was using and depleting the TENS supplies included with the Twin Stim IV package before shipping out the replenishment supplies.

250. The Defendants failed to determine, by communicating with the prescribing provider, whether continued use of the TENS units was warranted, safe and/or medically necessary before shipping out the replenishment supplies.

251. The Defendants unlawfully make the unilateral medical decision to send replacement supplies for the extended use of the device for at least six additional months to a year which they are not qualified to make.

252. Urbina confirmed this fact at his 2024 deposition, as set out below.

> 11    Q    Yeah.  I mean, did the doctor have any input
> 12    into which type or model of TENS unit that you sent,
> 13    or was it just Summerlin's decision?
> 14    A    It was Summerlin's decision.
> 15    Q    Okay.  And there was never an order, am I
> 16    correct, from any sort of medical provider to send
> 17    Mr. H███████ more equipment or supplies; correct?
> 18    A    No, there's not an order for that.
> 19    Q    So who determined that Mr. H███████ should
> 20    get more supplies.
> 21    A    Summerlin Medical.

253.    The replenishment supplies were simply a means by which the Defendants could increase the value of their reimbursement from Allstate.

254.    Incredibly, the Defendants billed for ion replacement batteries to Allstate claimants with full knowledge that the Twin Stim IV package is equipped with a ***rechargeable*** LCD battery.

255.    Even if the batteries were sent, which they were not, the batteries were not medically necessary, were not requested, not compensable, and were duplicative of the rechargeable batteries sold with the Twin Stim IV units.

256.    In addition to the foregoing, when the Defendants billed Allstate for the replenishment supplies, they also billed an additional $150.00 - $250.00 under HCPCS A9901 for the reported distribution and set up of the replenishment supplies, which did not occur.

E.    <u>**EXEMPLARS CLAIMS**</u>

257.    Below is a representative sample of specific claim submissions that exemplify the Defendants' fraudulent scheme.

**Business: GUO**
**Claimant: N.R.**
**DOL: October 11, 2019**
**Allstate Claim No.: 0564303204**

258.    On October 11, 2019, Allstate claimant, N.R., was reportedly involved in a motor vehicle accident in Chicago, IL.  As a result of the accident, N.R. reportedly sustained injuries to his neck, back, and shoulders.

259.    N.R. consulted Scott Martin, D.O., who examined N.R. at the Pain Center of Illinois.

260.    On October 17, 2019, Dr. Martin wrote N.R. a prescription for a TENS unit.

261.    On information and belief, Dr. Martin or an employee of the Pain Center of Illinois sent the prescription for the TENS unit directly to GUO.

262.    N.R. was not provided with the price of the DME, nor provided with the opportunity to purchase the TENS unit from an alternative provider, distributor, or pharmacy.

263.    On October 21, 2019, a "technician" employed by GUO, delivered the TENS unit to N.R. at home.

264.    According to N.R., the "technician," who is not identified by name, credentials, or licensure, on any of the records or bills submitted by GUO, apparently instructed N.R. in the operation of the TENS unit and the contraindications associated with its use.

265.    In the records, GUO misrepresented that the "technician" also fitted N.R. for a brace.  Notably, a brace was never prescribed or provided to N.R.

266.    At the end of the visit, the "technician" instructed N.R. to execute a "Patient Orientation Checklist," wherein, GUO represented that the "technician" was "qualified."

267.    The technician is not licensed, and not a "qualified" healthcare professional.

268.    By signing the "Patient Orientation Checklist," N.R. assigned his benefits to GUO, thereby authorizing payment for the TENS unit, and related services and supplies, directly to GUO or "an authorized subcontractor."

269.    On information and belief, Summerlin, Flexus and Eastern are authorized subcontractors who may, and have collected benefit payments on behalf of GUO from Allstate.

270.    GUO subsequently submitted an invoice to Allstate for the TENS unit, supplies, and related services performed by the "technician."

271.    GUO billed $1,311.64 pursuant to HCPCS E0745-NU, representing that it supplied N.R. with a "[new] [n]euromuscular stimulator, electric shock unit."

272.    Notably, Dr. Martin prescribed a TENS unit to N.R.

273.    Moreover, N.R. was allegedly provided with a TENS unit.

274.    Although GUO did not identify the make or model of the TENS unit it supplied to N.R. in any of its records, N.R. has identified the unit as a Twin Stim IV.

275.    Despite the prescription for a TENS unit, GUO billed for an expensive NEMS unit pursuant to HCPCS E0745.

276.    As discussed above, the Twin Stim IV package is equipped with the following product features:

- TENS unit;

- Four-Pack Electrode Pads;

- Two Electric Lead Wires;

- Wall & USB Charger; and

- Rechargeable 3.7 Lithium Ion Battery with LED Charging Indicator Light.

277.    In addition to billing Allstate $1,311.64 for the Twin Stim IV package, GUO billed Allstate $76.95 for two additional lead wires, additional electrodes, and an extra wall and USB charger that were not medically necessary, and were duplicative.

278.    Significantly, these additional supplies were never provided to N.R.

279.    Approximately one month later, on or around November 18, 2019, without a speaking to N.R., or receiving a prescription from N.R's medical provider concerning the medical necessity and continued use of the TENS unit, GUO unilaterally decided that it was medically necessary for N.R to continue using the TENS unit.

280.    GUO billed $865.76 for replenishment supplies pursuant to HCPCS A4556 (electrodes), A4557 (lead wires), A4630 (alkaline batteries), and A9901 for delivery and set-up of the replenishment supplies by GUO "technicians," which did not occur.

281.    GUO represented that the replenishment supplies included a year's supply of electrodes, and alkaline batteries.

282.    As set forth above, the Twin Stim IV package is equipped with a rechargeable battery.  Even if the batteries were sent, which they were not, the batteries were not medically necessary, were not requested, not compensable, and were duplicative of the rechargeable batteries sold with the TWIN Stim IV units.

283.    N.R. confirmed he did not receive the replenishment supplies GUO represented shipped in its November 18, 2019 invoice.

284.    The Defendants fraudulently billed for DME that was not provided to N.R., and that was medically unnecessary.

285.    All of the fraudulent documentation for DME allegedly dispensed to N.R. was sent through the U.S. Mail.

**Business: GUO**
**Claimant: M.K.**
**DOL: July 1, 2019**
**Allstate Claim No.: 0561500364**

286.    On July 1, 2019, Allstate claimant, M.K. was reportedly involved in a motor vehicle accident in Chicago, IL.  As a result of the accident, M.K. apparently sustained injuries to his neck, chest, and lower back.

287.    M.K. consulted Scott Martin, D.O., who examined M.K. at the Pain Center of Illinois.

288.    On July 5, 2019, Dr. Martin wrote M.K. a prescription for a TENS unit.

289.    On information and belief, Dr. Martin or an employee of the Pain Center of Illinois sent the prescription for the TENS unit directly to GUO.

290.    M.K. was not provided with the price of the DME, nor provided with the opportunity to purchase the TENS unit from an alternative provider, distributor, or pharmacy.

291.    On or around July 10, 2019, GUO mailed M.K. a TENS unit.

292.    A GUO "technician" did not present to M.K.'s home.

293.   A GUO "technician" did not train M.K. on the use of the TENS unit, or the contraindications associated with its use.

294.   Instead, Dr. Martin provided M.K. with instructions on the operation of the TENS unit.

295.   Dr. Martin billed Allstate for this, and all the services he provided.

296.   GUO, nevertheless, submitted an invoice to Allstate for a TENS unit, supplies, and the services purportedly performed by the "technician."

297.   GUO improperly billed Allstate $150.00 under HCPCS A9901 representing that a GUO "technician" set up the TENS unit, and performed the related training service with M.K.

298.   On July 10, 2019, GUO billed $1,311.64 pursuant to HCPCS E0745 – NU, representing that it supplied M.K. with a "[new] [n]euromuscular stimulator, electric shock unit."

299.   Notably, Dr. Martin prescribed a TENS unit.

300.   Moreover, M.K. was allegedly provided with a TENS unit.

301.   Despite the prescription for a TENS unit, GUO billed for an expensive NEMS unit pursuant to HCPCS E0745.

302.   Although GUO did not identify the make or model of the TENS unit it supplied to M.K. in any of its records, M.K. has identified the unit as a Twin Stim IV.

303.   In addition to billing Allstate $1,311,64 for the Twin Stim IV, it also improperly billed $76.95 for two additional lead wires, electrodes, and an extra wall and USB charger that were not medically necessary, and duplicative.

304.   M.K. did not receive these extra supplies.

305.	Approximately one month later, on August 6, 2019, without speaking to M.K., or receiving a prescription from M.K.'s medical provider concerning the medical necessity and continued use of the TENS unit, GUO unilaterally decided that it was medically necessary for M.K. to continue using the TENS unit.

306.	GUO billed $865.76 for replenishment supplies pursuant to HCPCS A4556 (electrodes), A4557 (lead wires), A4630 (alkaline batteries), and A9901 for delivery and set-up of the replenishment supplies by GUO "technicians," which did not occur.

307.	The alleged replenishment supplies included over a year's supply of electrodes, and alkaline batteries.

308.	As set forth above, the Twin Stim IV package is equipped with a rechargeable battery.  Even if the batteries were sent, which they were not, the batteries were not medically necessary, were not requested, not compensable, and were duplicative of the rechargeable batteries sold with the TWIN Stim IV units.

309.	M.K. confirmed that he did not receive the replenishment supplies GUO represented in its August 6, 2019 invoice.

310.	The Defendants fraudulently billed for DME that was not provided to M.K., and that was medically unnecessary.

311.	All of the fraudulent documentation for DME allegedly dispensed to M.K. was sent through the U.S. Mail.

**Business: GUO**
**Claimant: A.G.**
**DOL: March 18, 2019**
**Allstate Claim No.: 0541120275**

312.    On March 18, 2019, Allstate claimant, A.G. was reportedly involved in a motor vehicle accident in Chicago, IL.  As a result of the accident, A.G. apparently sustained injuries to his lower back.

313.    A.G. consulted Ravi Barnabas, M.D., who examined A.G. at the Rand Medical Center.

314.    On March 27, 2019, Dr. Barnabas wrote A.G. a prescription for a TENS unit and a "back brace."

315.    On information and belief, Dr. Barnabas or an employee of the Rand Medical Center sent the prescription for the TENS unit and the back brace directly to GUO.

316.    A.G. was not provided with the price of the DME, nor provided with the opportunity to purchase the TENS unit and back brace from an alternative provider, distributor, or pharmacy.

317.    On or around April 1, 2019, GUO shipped A.G. a TENS unit and a back brace.

318.    A GUO "technician" did not present to A.G.'s home.

319.    A GUO "technician" did not train A.G. on the use of the TENS unit or the back brace, or the contraindications associated with the use of the DME.

320.    Instead, Dr. Barnabas' assistant provided A.G. with instructions on the operation of the TENS unit over-the-phone and A.G. simply reviewed the instructions for the back brace that were written on the packaging.

321.    Dr. Barnabas billed Allstate for the services he provided.

322.     Pursuant to records produced by GUO, on April 1, 2019, a GUO "technician," who is not identified by name, credentials, or licensure, presented to A.G.'s home to deliver and set up the DME and teach A.G. how to use it.

323.     GUO improperly billed $150.00 under HCPCS A9901 representing that a GUO "technician" set up the TENS unit and back brace, and performed the related training service with A.G.

324.     GUO falsely represented the delivery and set-up on its April 1, 2019 records/bills.

325.     A.G. has confirmed that a GUO "technician" did not come to his home.

326.     GUO improperly billed $150.00 under HCPCS A9901 representing that a GUO "technician" set up the TENS unit and back brace, and performed the related training service with A.G.

327.     By submitting the "Patient Orientation Checklist" to Allstate, GUO represented that A.G. assigned his benefits to GUO, thereby authorizing payment for the TENS unit, back brace, and related services and supplies, directly to GUO or "an authorized subcontractor."

328.     On information and belief, Summerlin, Flexus and Eastern are authorized subcontractors who may and have collected benefit payments on behalf of GUO.

329.     On July 10, 2019, GUO billed $1,311.64 pursuant to HCPCS E0745 – NU, representing that it supplied A.G. with a "[new] [n]euromuscular stimulator, electric shock unit."

330.     Notably, Dr. Barnabas prescribed a TENS unit.

331.     Moreover, A.G. was allegedly provided with a TENS unit.

332.     Although GUO did not identify the make or model of the TENS unit it supplied to A.G. in any of its records, A.G. has identified the unit as a Twin Stim IV.

-46-

333. Despite the prescription for a TENS unit, GUO billed for an expensive NEMS unit pursuant to HCPCS E0745.

334. In addition to billing Allstate $1,311,64 for the Twin Stim IV, it also improperly billed Allstate $76.95 for two additional lead wires, electrodes, and an extra wall and USB charger that were not medically necessary, and duplicative.

335. A.G. did not receive the additional supplies.

336. Approximately one month later, on May 2, 2019, without speaking to A.G., or receiving a prescription from A.G.'s healthcare provider concerning the medical necessity and continued use of the TENS unit, GUO unilaterally decided that it was medically necessary for A.G. to continue using the TENS unit.

337. On May 2, 2019, GUO billed $865.76 pursuant to HCPCS A4556 (electrodes), A4557 (lead wires), A4630 (alkaline batteries), and A9901 for delivery and set-up of the replenishment supplies by GUO "technicians."

338. The alleged replenishment supplies included over a year's supply of electrodes, and alkaline batteries.

339. As set forth above, the Twin Stim IV package is equipped with a rechargeable battery. Even if the replenishment batteries were sent, which GUO did not, they were not needed, and only billed to inflate the invoice.

340. A.G. confirmed that he did not receive the replenishment supplies GUO represented in its May 2, 2019 invoice.

341. GUO also billed $3,435.19 pursuant to HCPCS L0637 for a lumbar-sacral back brace already provided to the claimants by Dr. Barnabas' office.

342. GUO did not identify the make and model of the back brace in its records or invoices.

343. A.G. confirmed that it was a SLEEQ® AP LSO Back Brace.

344. A similar lumbar-sacral brace can be purchased online for $179.00.

345. GUO utilized code HCPCS L0637, because it provided it with the opportunity to bill at a higher rate of reimbursement because the code represents that a qualified "individual with expertise… "trimmed, bent, molded, assembled, or otherwise customized" the lumbar-sacral orthosis (back brace) for A.G.

346. As stated above, GUO "technicians" are not "qualified" and do not have any medical "expertise," or medical licenses.

347. Regardless, and despite GUO's representations otherwise, GUO technicians did not provide any services to A.G.

348. The Defendants fraudulently billed for DME that was not provided to A.G., and that was medically unnecessary.

349. All of the fraudulent documentation for DME allegedly dispensed to A.G. was sent through the U.S. Mail.

**Business: Summerlin**
**Claimant: G.W.**
**DOL: May 15, 2020**
**Allstate Claim No.: 0586561986**

350. On May 15, 2020, Allstate claimant, G.W., was reportedly involved in a motor vehicle accident in Chicago, IL. As a result of the accident, G.W. claimed to have sustained injuries to his neck and left shoulder.

351.    Following the accident, G.W. consulted with Thomas Pontinen, M.D. at Midwest Anesthesia and Pain Specialists.

352.    On June 9, 2020, Dr. Pontinen wrote G.W. a prescription for a TENS unit.

353.    On information and belief, Dr. Pontinen, or someone employed with Midwest Anesthesia and Pain Specialists sent the prescription for the TENS unit directly to Summerlin.

354.    G.W. was not provided with the price of the DME, nor provided with the opportunity to purchase the TENS unit from an alternative provider, distributor, or pharmacy.

355.    Summerlin was not licensed to distribute DME in Illinois.

356.    Summerlin hid the fact that it was unlicensed from Allstate, the claimants, and the prescribing providers.

357.    According to G.W., he was handed a TENS unit while he was at an appointment at Midwest Anesthesia and Pain Specialists.

358.    No one from Summerlin trained G.W. on the use of the TENS unit.

359.    Instead, Dr. Pontinen showed G.W. how to operate the TENS unit, and explained the contraindications associated with its use.

360.    Dr. Pontinen billed Allstate for this, and all the services he provided.

361.    Pursuant to records produced by Summerlin, on June 15, 2020, a Summerlin "technician," who is not identified by name, credentials, or licensure, presented to G.W.'s home to deliver and set up the DME and teach G.W. how to operate it.

362.    Summerlin falsely represented the delivery and set-up on its June 15, 2020 records/bills.

363.    G.W. has confirmed that a Summerlin "technician" did not come to his home.

364.    By submitting the "Patient Orientation Checklist" to Allstate, Summerlin represented that G.W. assigned his benefits to Summerlin, thereby authorizing payment for the TENS unit, and related services and supplies, directly to Summerlin or "an authorized subcontractor."

365.    On information and belief, GUO, Flexus and Eastern are authorized subcontractors who may and have collected benefit payments on behalf of Summerlin.

366.    On June 11, 2020, Summerlin subsequently submitted an invoice to Allstate for the TENS unit, supplies and related services (that were not actually performed by the "technician").

367.    Summerlin unlawfully billed Allstate $150.00 under HCPCS A9901 misrepresenting that a GUO "technician" set up the TENS unit, and performed the related training service with G.W.

368.    On June 11, 2020 Summerlin billed $682.08 pursuant to HCPCS E0720– NU, representing that it supplied G.W. with a "[t]ranscutaneous electrical nerve stimulation (TENS) device, two lead localized stimulation."

369.    Although Summerlin did not identify the make or model of the TENS unit it supplied to G.W. in any of its records, G.W. has identified the unit as a Twin Stim IV.

370.    In addition to billing Allstate $682.08 for the Twin Stim IV package, it billed Allstate $76.95 for two additional lead wires, additional electrodes, and an extra wall and USB charger that were not medically necessary, and duplicative.

371.    G.W. did not receive the additional supplies.

372.    Approximately one month later, on July 13, 2020, without G.W. requesting additional supplies, or receiving a prescription from G.W.'s medical provider concerning the

medical necessity for the continued use of the TENS unit, GUO unilaterally decided that it was medically necessary for G.W. to continue using the TENS unit.

373. On July 13, 2020, Summerlin unlawfully billed $612.56 billed for the replenishment supplies pursuant to HCPCS A4556 (electrodes), A4557 (lead wires), A4630 (alkaline batteries), and A9901 for delivery and set-up of the replenishment supplies by GUO "technicians," which did not occur.

374. The alleged replenishment supplies included over a year's supply of electrodes, and alkaline batteries.

375. As set forth above, the Twin Stim IV package is equipped with a rechargeable battery, even if the replenishment batteries were sent, which Summerlin did not, they were not needed, and only billed to inflate the invoice.

376. G.W. confirmed that he did not receive any of the additional supplies Summerlin billed for in the August 6, 2019 invoice.

377. On October 18, 2020, Greenspan served G.W., G.W.'s counsel, and Allstate with Summerlin's Physician Lien through the US Mail, which misrepresented that Summerlin was properly licensed pursuant to Illinois law.

378.     The Defendants fraudulently billed for DME that was not provided to G.W., and that was medically unnecessary.

379.     All of the fraudulent documentation for DME allegedly dispensed to G.W. was sent through the U.S. Mail.

**Business: Summerlin**
**Claimant: K.R.**
**DOL: March 6, 2021**
**Allstate Claim No.: 0618226153**

380.     On March 6, 2021, Allstate claimant, K.R., was reportedly involved in a motor vehicle accident in Romeoville, IL. As a result of the accident, K.R. claimed to have sustained injuries to his neck, lower back, and left shoulder.

381.     Following the accident, K.R. consulted Nurse Practitioner Poell at Midwest Anesthesia and Pain Specialists.

382.     On March 10, 2021, Ms. Poell, NP wrote K.R. a prescription for a TENS unit.

383.     According to K.R., he was handed a TENS unit while he was at Midwest Anesthesia and Pain Specialists.

384.     According to K.R., it was an employee of Midwest Anesthesia and Pain Specialists who showed him how to operate the TENS unit and who discussed the contraindications associated with its use.

385.     K.R. was not provided with the price of the DME, nor the opportunity to purchase the TENS unit from an alternative provider, distributor, or pharmacy.

386.     Summerlin is not licensed to distribute DME in Illinois

387.     Summerlin hid the fact that it was unlicensed from Allstate, the claimants, and the prescribing providers.

388.     On information and belief, either Ms. Poell, NP or someone employed with Midwest Anesthesia and Pain Specialists sent the prescription for the TENS unit directly to Summerlin.

389.     K.R. has confirmed that a Summerlin "technician" did not come to his home.

390.     K.R. has confirmed that a Summerlin "technician" did not train him on how to operate the TENS unit or discuss the contraindications associated with its use.

391.     Regardless, a "Patient Orientation Checklist" submitted by Summerlin with its invoices, misrepresents that a "technician" from Summerlin delivered the TENS unit, and trained K.R. on its use and the associated contraindications, at his home.

392.     Summerlin also misrepresented that the "technician" also fitted K.R. for a brace.  A brace was never prescribed or provided to K.R.

393. The "Patient Orientation Checklist" also represents that K.R. assigned his benefits to Summerlin, thereby authorizing payment for the TENS unit, and related services and supplies, directly to Summerlin or "an authorized subcontractor."

394. On information and belief, GUO, Flexus, and Eastern are authorized subcontractors who may and have collected benefit payments on behalf of Summerlin.

395. On June 11, 2020, Summerlin submitted an invoice in connection with K.R. for the TENS unit, supplies, and services (that were not performed by the "technician").

396. Significantly, Summerlin billed $682.08 pursuant to HCPCS E0720 – NU, representing that it supplied K.R. with a "[new][t]ranscutaneous electrical nerve stimulation (TENS) device, two lead localized stimulation."

397. Although Summerlin does not identify the make or model of the TENS unit it supplied to K.R. on its records, K.R. has identified the unit as a Twin Stim IV.

398. In addition to billing Allstate $682.08 for the Twin Stim IV package, it billed Allstate $76.95 for two additional lead wires, additional electrodes, and an extra wall and USB charger, which were duplicative, and not medically necessary nor provided to K.R.

399. Approximately one month later, on April 12, 2021, without K.R. requesting additional supplies, or receiving a prescription from K.R.'s medical provider concerning the medical necessity for the continued use of the TENS unit, Summerlin unilaterally decided that it was medically necessary for K.R. to continue using the TENS unit.

400. On April 12, 2021, Summerlin unlawfully billed $612.56 for replenishment supplies pursuant to HCPCS A4556 (electrodes), A4557 (lead wires), A4630 (alkaline batteries),

and A9901 for delivery and set-up of the replenishment supplies by Summerlin "technicians," which did not occur.

401.   The alleged replenishment supplies included over a year's supply of electrodes, and alkaline batteries.

402.   As set forth above, the Twin Stim IV package is equipped with a rechargeable battery.  Even if the batteries were sent, which they were not, the batteries were not medically necessary, were not requested, not compensable, and were duplicative of the rechargeable batteries sold with the Twin Stim IV units.

403.   K.R. confirmed that he did not receive any of the additional supplies Summerlin represented shipped to K.R. in the April 12, 2021 invoice.

404.   On March 28, 2021, Greenspan served K.R., K.R.'s counsel, and Allstate with Summerlin's Physician Lien through the US Mail, which misrepresented that Summerlin was properly licensed pursuant to Illinois law.



405.   The Defendants fraudulently billed for DME that was not provided to K.R., and that was medically unnecessary.

406.    All of the fraudulent documentation for DME allegedly dispensed to K.R. was sent through the U.S. mail.

**Business: Summerlin**
**Claimant: S.W.**
**DOL: April 5, 2021**
**Allstate Claim No.: 0621509397**

407.    On April 5, 2021, Allstate claimant, S.W., was reportedly involved in a motor vehicle accident in Chicago, IL.

408.    As a result of the accident, S.W. claimed to have sustained injuries to his neck and left shoulder.

409.    Following the accident, S.W. consulted Intessar Hussain, M.D. at the Pain Center of Illinois.

410.    On April 9, 2021, Dr. Hussain wrote S.W. a prescription for a TENS unit.

411.    On information and belief, Dr. Hussain, or someone employed with the Pain Center of Illinois sent the prescription for the TENS unit directly to Summerlin.

412.    S.W. was not provided with the price of the DME, nor provided with the opportunity to purchase the TENS unit from an alternative provider, distributor, or pharmacy.

413.    Summerlin was not licensed to distribute DME in Illinois.

414.    Summerlin hid the fact that it was unlicensed from Allstate, the claimants, and the prescribing providers.

415.    According to S.W., an employee of Summerlin met S.W. at work, and showed S.W. how to operate the TENS unit, and explained the contraindications associated with its use.

416.     Pursuant to records produced by Summerlin, on April 23, 2021, a Summerlin "technician," who is not identified by name, credentials, or licensure, presented to S.W.'s home to deliver and set up the DME and teach S.W. how to operate it.

417.     Summerlin misrepresented that the "technician" also fitted S.W. for a brace.  A brace was never prescribed or provided to S.W.

418.     By submitting the "Patient Orientation Checklist" to Allstate, Summerlin represented that S.W. assigned his benefits to Summerlin, thereby authorizing payment for the TENS unit, and related services and supplies, directly to Summerlin or "an authorized subcontractor."

419.     On information and belief, GUO, Flexus and Eastern are authorized subcontractors who may and have collected benefit payments on behalf of Summerlin.

420.     On April 23, 2021, Summerlin billed $682.08 pursuant to HCPCS E0720– NU, representing that it supplied S.W. with a "[t]ranscutaneous electrical nerve stimulation (TENS) device, two lead localized stimulation."

421.     Although Summerlin did not identify the make or model of the TENS unit it supplied to S.W. in any of its records, S.W. has identified the unit as a Twin Stim IV.

422.     In addition to billing Allstate $682.08 for the Twin Stim IV package, it billed Allstate $76.95 for two additional lead wires, additional electrodes, and an extra wall and USB charger, which were duplicative, not medically necessary, nor provided to G.W.

423.     Approximately one month later, on May 24, 2021, without G.W. requesting additional supplies, or receiving a prescription from G.W.'s medical provider concerning the

medical necessity for the continued use of the TENS unit, Summerlin unilaterally decided that it was medically necessary for S.W. to continue using the TENS unit.

424.    On May 24, 2021, Summerlin unlawfully billed $612.56 for replenishment supplies pursuant to HCPCS A4556 (electrodes), A4557 (lead wires), A4630 (alkaline batteries), and A9901 for delivery and set-up of the replenishment supplies by Summerlin "technicians," which did not occur.

425.    The alleged replenishment supplies included over a year's supply of electrodes, and alkaline batteries.

426.    As set forth above, the Twin Stim IV package is equipped with a rechargeable battery. Even if the batteries were sent, which they were not, the batteries were not medically necessary, were not requested, not compensable, and were duplicative.

427.    S.W. confirmed that he did not receive any of the additional supplies Summerlin billed for in the May 24, 2021 invoice.

428.    On May 6, 2021, Greenspan served S.W., S.W.'s counsel, and Allstate with Summerlin's Physician Lien, which misrepresented that Summerlin was properly licensed pursuant to Illinois law.  The Physician's Lien was sent through the US Mail.



429.    The Defendants fraudulently billed for DME that was not provided to S.W., and that was medically unnecessary.

430.    All of the fraudulent documentation for DME allegedly dispensed to S.W. was sent through the U.S. Mail.

**Business: Flexus**
**Claimants: M.V., M.V.J., and I.R.M.**
**DOL: 11/27/22**
**Allstate Claim No.: 0693723966**

431.    On November 27, 2022, Allstate claimants, M.V., M.V.J., and I.R.M. were reportedly in the same vehicle when they were involved in a motor vehicle accident in Rosemont, IL.

432.    M.V., who was the driver, claimed that he sustained injuries to his neck and bilateral shoulders.

433.    M.V.J., who was a backseat passenger, claimed to have injured his bilateral knees and his jaw.

434.    I.R.M., who was a front seat passenger, claimed to have injured her head, neck, and back.

435.    Following the accident, M.V. and M.V.J., consulted Neema Bayran, M.D. at the Pain Center of Illinois.

436.    Despite their unique injuries, the claimants were separately prescribed identical DME products.

437.    On January 9, 2023, Dr. Bayran wrote M.V. and M.V.J. separate prescriptions for a TENS unit.

438.    That same day, Dr. Bayran apparently wrote I.R.M. a prescription for a TENS unit - although I.R.M. never consulted Dr. Bayran at the Pain Center of Illinois.

439.    On information and belief, Dr. Bayran or an employee of the Pain Center of Illinois provided the prescriptions for the TENS units directly to Flexus.

440.    M.V. M.V.J., and I.R.M. were not provided with the price of the DME, nor provided with the opportunity to purchase the TENS units from an alternative provider, distributor, or pharmacy.

441.    All three of the claimants received their own TENS units by way of U.S. Mail.

442.    According to M.V., the three claimants live together.

443.    Pursuant to records produced by Flexus, on January 13, 2023, a Flexus "technician," who is not identified by name, credentials, or licensure, presented to claimants' home

to deliver and set up the DME and show M.V., M.V.J., and I.R.M. how to operate the TENS units, and to discuss the contraindications associated with the use of the products.

444.    M.V. has confirmed that no one from Flexus personally came to his house to deliver the TENS units, nor to discuss the operation of the units or contraindications associated with use of the units.

445.    Flexus improperly billed Allstate $750.00 in total ($250.00 for purported training session for each claimant) under HCPCS A9901, thereby representing that Flexus "technicians" set up the TENS units and trained the claimants on their operation.

446.    On January 13, 2023, Flexus billed $682.08 for each TENS unit for a total of $2,046.24 pursuant to HCPCS E0720, representing that it supplied M.V., M.V.J., and I.R.M. with a "[t]ranscutaneous electrical nerve stimulation (TENS) device, two lead localized stimulation."

447.    Although Flexus did not identify the make or model of the TENS unit it supplied to M.V., M.V.J., and I.R.M. in any of its records, M.V. has confirmed that the TENS units were all Twin Stim IV, and that the Twin Stim packages came with written instructions and supplies.

448.    In addition to billing Allstate $682.08 for each Twin Stim IV package, it billed Allstate at a total of $230.85 for two additional lead wires, additional electrodes, and an extra wall and USB charger, which were duplicative, medical unnecessary and not provided to M.V., M.V.J., and I.R.M.

449.    Approximately one month later, on February 14, 2023, without M.V., M.V.J., and I.R.M requesting additional supplies, or receiving a prescription from M.V., M.V.J., and I.R.M's medical providers concerning the medical necessity for the continued use of the TENS unit, Flexus

unilaterally decided that it was medically necessary for M.V., M.V.J., and I.R.M to continue using the TENS units.

450. On February 14, 2023, Flexus unlawfully billed at total of $2,137.68 for the replenishment supplies purportedly sent to M.V., M.V.J., and I.R.M pursuant to HCPCS A4556 (electrodes), A4557 (lead wires), A4630 (alkaline batteries), and A9901 for delivery and set-up of the replenishment supplies by Flexus "technicians," which did not occur.

451. The alleged replenishment supplies included over a year's supply of electrodes, and alkaline batteries for each claimant.

452. As set forth above, the Twin Stim IV package is equipped with a rechargeable battery. Even if the batteries were sent, which they were not, the batteries were not medically necessary, were not requested, not compensable, and were duplicative.

453. M.V. confirmed that he did not receive any of the additional supplies Flexus billed for in the February 14, 2023 invoice.

454. The Defendants fraudulently billed for DME that were not provided to the claimants, and that was medically unnecessary.

455. All of the fraudulent medical documentation for DME allegedly dispensed to the claimants were sent through the U.S. mail.

**Business: Flexus**
**Claimant: M.C.**
**DOL: February 21, 2023**
**Allstate Claim No.: 0703613919**

456. On February 21, 2023, Allstate claimant, M.C., was reportedly involved in a motor vehicle accident in North Hammond, IN. As a result of the accident, M.C. claimed that she sustained injuries to her neck, chest, and her right arm.

457. Although M.C. resided in Indiana, M.C. consulted Chad Allen Lee, M.D. at the Pain Center of Illinois.

458. On April 13, 2023, Dr. Lee wrote M.C. a prescription for an arm brace, wherein he referred to M.C.'s condition as "tennis elbow."

459. On information and belief, Dr. Lee, or someone employed with the Pain Center of Illinois sent the prescription for the brace directly to Flexus.

460. M.C. was not given the price of the DME, nor provided with the opportunity to purchase the brace from an alternative provider, distributor, or pharmacy.

461. Flexus is not licensed to distribute DME in Indiana.

462. Pursuant to IC 25-26-21-6(a), "[a] person seeking to provide home medical equipment services in Indiana shall apply to the board for a license."

463. Pursuant to IC 25-26-21(11)(a)(1)-(2) " [a] person who engages in the business of home medical equipment services and who…is required to be licensed under this chapter; and knowingly provides home medical equipment services without a license… commits a Class A misdemeanor."

464. Flexus hid its lack of licensure from Allstate, M.C., and the prescribing provider.

465. According to M.C., the arm brace was delivered to her home by someone who apparently left the DME at the front door.

466. No one from Flexus trained or fitted M.C. with the arm brace.

467. Instead, the providers of the Pain Center of Illinois showed M.C. how to operate the arm brace at his request.

468. The Pain Center of Illinois billed Allstate for these, and all other services rendered.

469. Pursuant to records produced by Flexus, on April 14, 2023, a Flexus "technician," who is not identified by name, credentials, or licensure, set up the DME and taught M.C. how to use it.

470. M.C. confirmed that upon receipt of the brace, she was contacted by an employee from Flexus, who told her to take the brace to her prescribing provider so he could teach her how to use it.

471. As stated above, Flexus technicians are not "qualified" and do not have any medical licenses.

472. Regardless, and despite Flexus' representations otherwise, Flexus technicians did not provide any services to M.C.

473. Flexus improperly billed Allstate $250.00 under HCPCS A9901, thereby representing that a Flexus "technician" set up the arm brace and trained the M.C. how to use it.

474. By submitting a "Patient Orientation Checklist" to Allstate, Flexus represented that M.C. assigned her benefits to Flexus, thereby authorizing payment for the arm brace directly to Flexus or "an authorized subcontractor."

475. On information and belief, GUO, Summerlin, and Eastern are authorized subcontractors who may, and have collected benefit payments on behalf of Flexus.

476. On April 14, 2023, Flexus billed $695.00 pursuant to HCPCS L3908 for an off-the-shelf arm brace dispensed to M.C., and related services (that were not performed by a Flexus "technician").

477. By utilizing HCPCS L3908, Flexus represented that it supplied M.C. with an "off-the-shelf… prefabricated" wrist brace.

478. Although Flexus did not identify the make or model of the wrist brace it supplied to M.C. in any of its records, M.C. confirmed it was a Surround Elbow Support brace.

479. The same or similar Surround Elbow Support brace can be purchased online for approximately $15.00.

480. The Defendants fraudulently billed for DME that was not provided to M.C., and that was medically unnecessary.

481. All of the fraudulent documentation for DME allegedly dispensed to M.C. was sent through the U.S. Mail.

**Business: Eastern**
**Claimant: D.M.M., D.B. (front seat) and D.B. (back seat)**
**DOL: December 6, 2022**
**Allstate Claim No.: 0694742206**

482. On December 6, 2022, Allstate claimants, D.M.M., D.B. (front seat), and D.B. (backseat) were in the same vehicle, which was involved in a motor vehicle accident in Milwaukee, WI. D.M.M. was the driver. D.B (front seat) was the front seat passenger, and D.B. (backseat) was the back seat passenger.

483. D.M.M. claimed that she injured her head, neck, and lower back.

484. D.B. (front seat) claimed that she injured her left hip, and leg.

485. D.B. (backseat) claimed that he sustained injuries to his back and bilateral shoulders.

486. As described below, all three of these claimants, despite their unique injuries, were all prescribed identical DME products.

487. The claimants were examined by Corey Schenieder, D.C. at Goodyear Chiropractic Center for Health.

488. On December 20, 2022, Dr. Schneider wrote both D.B. (front seat) and D.B. (backseat) a prescription for a TENS unit and back brace on pre-printed prescription forms provided by Eastern.

489. On December 23, 2022, Dr. Schenieder wrote D.M.M. a prescription for a TENS unit and back brace on a pre-printed prescription form provided by Eastern.

490. On information and belief, Dr. Schneider, or someone employed by the Goodyear Chiropractic Center for Health sent the claimants' prescriptions for a TENS units and back braces directly to Eastern.

491. Neither D.M.M., D.B. (front seat), nor D.B. (backseat) were provided with the price of the DME, nor given with the opportunity to purchase the TENS units and back braces from an alternative provider, distributor, or pharmacy.

492. Eastern is not licensed to distribute DME in Wisconsin.

493. Eastern hid its lack of licensure from the claimants, Allstate, and the prescribing providers.

494.    According to D.M.M., D.B. (front seat), and D.B. (backseat), they were each given a TENS unit and back brace while they were at an appointment with Dr. Schenieder.

495.    No one from Eastern trained D.M.M., D.B. (front seat), nor D.B. (backseat) on the use of the TENS units or back braces.

496.    Instead, the providers of the Goodyear Chiropractic Center for Health showed D.M.M, D.B. (front seat), and D.B. (backseat) how to operate the TENS unit and wear the back brace, and explained the contraindications associated with their use.

497.    Dr. Schenieder billed Allstate for these, and other services he provided.

498.    Pursuant to records produced by Eastern, on December 20, 2022 an Eastern "technician," who is not identified by name, credentials, or licensure, set up the DME and taught D.B. (front seat) and D.B. (backseat) how to use it.

499.    Pursuant to records produced by Eastern, on December 23, 2022 an Eastern "technician," who is not identified by name, credentials, or licensure, set up the DME and taught D.M.M. how to use it.

500.    An employee of Eastern did not train D.D.M, D.B. (front set), or D.B. (backseat) on the use of the TENS units or back braces, or the contraindications associated with their use.

501.    By submitting the "Patient Orientation Checklist" to Allstate with its invoices, Eastern represented that all three claimants assigned their benefits to Eastern, thereby authorizing payment for the TENS units and back braces, supplies and services, directly to Eastern or "an authorized subcontractor."

502.    On information and belief, GUO, Summerlin, and Flexus are authorized subcontractors who may, and have collected benefit payments on behalf of Eastern.

503. On December 20, 2022, Eastern billed $365.00 pursuant to HCPCS E0720 for a TENS unit and supplies dispensed to D.B. (front seat), and related services (that were not performed by an Eastern "technician").

504. On December 20, 2022, Eastern billed $365.00 pursuant to HCPCS E0720 for a TENS unit and supplies dispensed to D.B. (backseat), and related services (that were not performed by an Eastern "technician").

505. On December 23, 2022, Eastern billed $365.00 pursuant to HCPCS E0720 for a TENS unit and supplies dispensed to D.M.M. and related services (that were not performed by an Eastern "technician").

506. By utilizing HCPCS E0720 – NU, Eastern represented that it supplied each of the claimants with their own "[new][t]ranscutaneous electrical nerve stimulation (TENS) device, two lead localized stimulation."

507. Eastern improperly billed Allstate $750.00 in total ($250.00 for the purported training session for each claimant) under HCPCS A9901, thereby representing that Eastern "technicians" set up the TENS units, back braces, and trained the claimants on their operation.

508. Although Eastern did not identify the make or model of the TENS units it supplied to the claimants in any of its records, D.B. (backseat) confirmed his unit was a Twin Stim IV.

509. On information and belief, D.M.M. and D.B. (front seat) also each received a Twin Stim IV package.

510. In addition to billing Allstate $1,095.00 ($365.00 for each of the three Twin Stim IV packages), it billed Allstate a total of $230.79 for two additional lead wires, additional electrodes, and an extra wall and USB charger – each.

511. On information and belief, D.M.M. and D.B were not provided with these extra supplies. Even if they had, the additional supplies would be duplicative and medically unnecessary.

512. Approximately six days later on December 26, 2023, without the claimants requesting additional supplies, or receiving a prescription from their medical provider concerning the medical necessity for the continued use of the TENS units, Eastern unilaterally decided that it was medically necessary for the claimants to continue using the TENS units and represented to Allstate that it shipped the claimants replenishment supplies for which it billed Allstate an additional $789.24 ($263.08 for each claimant).

513. The alleged replenishment of supplies included over a year's supply of electrodes for each claimant.

514. D.M.M., D.B. (front seat), and D.B. (backseat) confirmed that they did not receive any of the additional supplies that Eastern misrepresented was provided to them in the December 26, 2022 invoice.

515. Eastern also submitted a separate December 20, 2022 invoice for the lumbar-sacral back braces already provided to the claimants by Dr. Schneider's office, wherein Eastern billed Allstate $7,011.84 ($2,337.28 for each back brace) by utilizing HCPCS code L0637.

516. Eastern did not identify the make and model of the back braces in its records or invoices.

517. Regardless, a lumbar-sacral brace can be purchased online for $89.99.

518. Eastern utilized HCPCS L0637, because it has a higher rate of reimbursement because it represents that a qualified "individual with expertise… "trimmed, bent, molded,

assembled, or otherwise customized" the lumbar-sacral orthosis (back brace) for D.B. (front seat) and D.B. (backseat).[4]

519.    As stated above, the Eastern "technicians" are not "qualified" and do not have any medical "expertise," or medical licenses.

520.    Despite Eastern's representations, Eastern technicians did not provide any services to the claimants.

521.    The Defendants fraudulently billed for DME that was not provided to the claimants, and that was medically unnecessary.

522.    All of the fraudulent documentation for DME allegedly dispensed to the claimants were sent through the U.S. Mail.

**Business: Eastern**
**Claimant: D.W. and D.D.**
**DOL: 3/13/23**
**Allstate Claim No.: 0706109139**

523.    On March 13, 2023, Allstate claimants, D.W. and D.D. were in the same vehicle, which was involved in a motor vehicle accident in Milwaukee, WI. D.W. was the driver. D.D. was the front seat passenger. D.W. claimed that she injured her right leg and arm. D.D. claimed that she injured her neck and back.

524.    As described below, despite their unique injuries, each was prescribed identical DME products.

---

[4] *"Medicare's HCPCS National Codes, Level II ..." Downers Grove, Ill.: Medical Administration Publications, 1987.*

525.     The claimants sought DME and services from Nicole Trochil, D.C. at Goodyear Chiropractic Center for Health.

526.     On or around March 24, 2023, Dr. Trochil wrote D.W. and D.B. a prescription for a TENS unit and back brace on pre-printed prescription forms provided by Eastern.

527.     On information and belief, Dr. Trochil, or someone employed by the Goodyear Chiropractic Center for Health sent the claimants' prescriptions for TENS units and back braces directly to Eastern.

528.     Neither D.W. nor D.D. were given the price of the DME, nor provided with the opportunity to purchase the TENS units and back braces from an alternative provider, distributor, or pharmacy.

529.     Eastern is not licensed to distribute DME in Wisconsin.

530.     Eastern hid the fact that it was unlicensed from the claimants, Allstate, and the prescribing providers.

531.     According to D.W. and D.D., they each were given their own TENS unit and back brace while they were at an appointment at the Goodyear Chiropractic Center for Health.

532.     No one from Eastern trained D.W. or D.D. on the use of the TENS units or back braces.

533.     Instead, the providers of the Goodyear Chiropractic Center for Health showed D.W. and D.D. how to operate the TENS unit and wear the back brace, and explained the contraindications associated with their use.

534.     The Goodyear Chiropractic Center for Health billed Allstate for these and other services.

535.    Pursuant to records produced by Eastern, on March 24, 2023, an Eastern "technician," who is not identified by name, credentials, or licensure, set up the DME and taught D.W. and D.D. how to use it.

536.    An employee of Eastern did not train D.W. and D.D. on the use of the TENS units or back braces, or the contraindications associated with their use.

537.    Eastern improperly billed Allstate $500.00 ($250.00 for each purported training session) under HCPCS A9901 when it misrepresented that an Eastern "technician" set up the TENS units, and trained D.W. and D.D. on their operation.

538.    By submitting the "Patient Orientation Checklist" to Allstate with its invoice, Eastern represented that D.W. and D.D. assigned their benefits to Eastern, thereby authorizing payment for the TENS unit and brace, supplies and services, directly to Eastern or "an authorized subcontractor."

539.    On information and belief, GUO, Summerlin, and Flexus are authorized subcontractors who may, and have collected benefit payments on behalf of Summerlin.

540.    On March 24, 2023, Eastern billed $365.00, pursuant to HCPCS E0720 for the TENS units dispensed to D.W. and D.D., supplies and related services (that were not performed by the "technician").

541.    By utilizing HCPCS E0720, Eastern represented that it supplied D.W. and D.D. each with their own "[new][t]ranscutaneous electrical nerve stimulation (TENS) device, two lead localized stimulation."

542.     Although Eastern did not identify the make or model of the TENS units it supplied to D.W. and D.D. in any of its records, on information and belief, the units were both a Twin Stim IV.

543.     In addition to billing Allstate $730.00 ($365.00 for each Twin Stim IV package), it billed Allstate D.W. and D.D. $153.86 for two additional lead wires, additional electrodes, and an extra wall and USB charger – each.

544.     On information and belief, D.W. and D.D were not provided with these extra supplies. Even if they had, the additional supplies would be duplicative and medically unnecessary.

545.     Approximately six days after receiving the Twin Stim Units, without the claimants requesting additional supplies, or receiving a prescription from their medical provider concerning the medical necessity for the continued use of the TENS units, Eastern unilaterally decided that it was medically necessary for the claimants to continue using the TENS units and represented to Allstate that it shipped the claimants' replenishment supplies for which it billed Allstate an additional $789.24 ($263.08 for each claimant).

546.     The alleged replenishment of supplies included over a year's supply of electrodes for D.W. and D.D.

547.     D.W. and D.D. confirmed that they did not receive any of the additional supplies billed by Eastern.

548.     Eastern also submitted a separate March 24, 2023 invoice for D.W. and D.D. for the lumbar-sacral back braces provided to D.W. and D.D., wherein it billed Allstate $4,674.56 ($2,337.28 for each back brace) by utilizing HCPCS code L0637.

549. Eastern utilized this code to demand a higher reimbursement rate because it requires a qualified "individual with expertise… "trimmed, bent, molded, assembled, or otherwise customized" the lumbar-sacral orthosis (back brace) for D.W. and D.D.

550. As stated above, Eastern technicians are not "qualified" and do not have any medical "expertise."

551. Despite Eastern's representations, Eastern technicians did not provide any services to D.W. and D.D.

552. The Defendants fraudulently billed for DME that was not provided to the claimants and that were medically unnecessary.

553. All of the fraudulent documentation for DME allegedly dispensed to the claimants were sent through the U.S. Mail.

## VI.     MATERIAL MISREPRESENTATIONS AND JUSTIFIABLE RELIANCE

### A.     MATERIAL MISREPRESENTATIONS MADE BY DEFENDANTS

554. The Defendants submitted, or caused to be submitted, documentation that misrepresented and omitted material facts about the billed-for medical supplies, and services to induce Allstate to pay the fraudulent charges for unnecessary, unlawful, and undelivered DME supplies and services.

555. The Defendants fraudulent scheme involved billing for DME for the benefit of Allstate claimants (1) for the unlicensed dispensing of DME; (2) for DME not dispensed to Allstate claimants; (3) based on unlawful prescriptions (or no prescriptions at all); (4) for unnecessary DME provided pursuant to a predetermined treatment protocol; and (5) at grossly excessive charges.

556.     The Defendants' invoices were issued on Health Insurance Claim Forms (HCFA), which are medical billing forms approved by the National Uniform Claim Committee (NUCC).

557.     All HCFA forms contain the following warning in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

558.     As alleged herein, the Defendants ignored this warning; instead, they created and submitted a multitude of records and bills on behalf of GUO, Summerlin, Flexus, and Eastern that contained false information.

559.     The Defendants attested to the necessity of the billed-for DME services through these records and bills, which the Defendants mailed to Allstate using the U.S. Mail.

560.     Every record and bill created and mailed by the Defendants constitutes a material misrepresentation so long as the records and bills relate to GUO, Summerlin, Flexus, and Eastern's charges for (a) services that were unnecessary, (b) services that were rendered in violation of Illinois law, Wisconsin, and Indiana law, and (c) services that were not rendered at all or as represented.

561.     The Defendants knew, and it was reasonably foreseeable, that their patients, or their patients' representatives, would submit the Defendants' bills, and related documentation, through the U.S. Mail when they sought claim settlement payments from Allstate.

562.     In these instances, documents submitted to Allstate through the U.S. Mail included records and bills generated by the Defendants with respect to GUO, Summerlin, Flexus, and Eastern.

563.     As part of this scheme, Defendants intended for Allstate to act in reliance on the statements and representations contained in the records and bills concerning the DME.

564.     In reasonable reliance on the statements and representations contained in the records and bills concerning the DME, Allstate did in fact tender payment to GUO, Summerlin, Flexus, and Eastern.

### B.     ALLSTATE'S JUSTIFIABLE RELIANCE

565.     At all relevant times, the Defendants acted with the intent to conceal from Allstate their misconduct in connection with the scheme to defraud.

566.     The Defendants submitted, or caused to be submitted, records, and itemized billing statements detailing the DME purportedly distributed and the DME services rendered to Allstate claimants.

567.     The Defendants created records, reports, and bills knowing that these documents would be submitted to Allstate in support of settlement demand letters, which contained representations that the DME was distributed and the DME services rendered to Allstate claimants were reasonable and necessary to address the injuries purportedly suffered by the Allstate claimants.

568.     The Defendants knowingly misrepresented and concealed material facts to prevent Allstate from discovering that the Defendants billed Allstate (1) for the unlicensed dispensing of DME; (2) for DME not dispensed to Allstate claimants; (3) based on unlawful prescriptions (or no prescriptions at all); (4) for unnecessary DME provided pursuant to a predetermined treatment protocol; and (5) at grossly excessive charges.

569.    Each individual billing statement submitted to Allstate references the date of service(s).

570.    The Defendants' records identify the claimants' name, date of loss, date of service, the type of product and service purportedly provided, and the amount billed for such service.

571.    The Defendants knowingly misrepresented and concealed material facts to prevent Allstate from discovering that the DME and services provided by the Defendants were not lawfully rendered and not compensable under Illinois law, Wisconsin Law, Indiana Law, or the terms of the applicable insurance policies.

572.    The Defendants' acts were self-concealing by their very nature.

573.    When Allstate receives treatment documentation from a provider, such documentation is reviewed and processed in accordance with the applicable policy of insurance, and the applicable statutes and regulations governing the adjustment of insurance claims.

574.    Specifically, records and invoices are reviewed to determine (a) whether the purported healthcare treatment are a covered service, (b) whether coverage exists under the applicable policy of insurance, and (c) the sufficiency of the charged amount under the applicable fee schedule(s).

575.    Moreover, when Allstate receives a settlement demand from a claimant or the claimant's personal injury attorney, the contents of the demand are analyzed to determine (a) whether coverage exists under the applicable policy of insurance, and (b) whether the claimant's alleged injuries warrant a payment or settlement sufficient to compensate the claimant for the expenses incurred, and any bodily injury suffered as a result of the covered event (i.e., the subject motor vehicle accident).

576.   Allstate diligently reviewed each of the Defendants' submissions upon receipt.

577.   The Defendants' wrongdoing was not discovered during this period.

578.   Given the clandestine nature of the Defendants' scheme, it was impossible for Allstate to discover a clear pattern of misconduct during Allstate's investigation into each discrete insurance claim associated with the Defendants' scheme.

579.   Despite its due diligence, Allstate did not discover the Defendants' deception and the resulting injuries caused by such deception until shortly before filing this Complaint.

580.   Had Allstate not been misled by the representations contained in the Defendants' documentation and associated settlement demands, no payments would have been made on these claims.

## VII.   <u>SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY</u>

581.   The Defendants created, prepared, and submitted false documentation, and intentionally violated the laws of the United States by creating schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing or causing to be placed, in a post office and/or authorized depository for mail documents to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing such fraudulent schemes and attempting to do so.

582.   The DME and services purportedly provided and billed for by the Defendants was fraudulent because, the Defendants billed for DME to or for the benefit of Allstate claimants (1) for the unlicensed dispensing of DME; (2) for DME not dispensed to Allstate claimants; (3) based

on unlawful prescriptions (or no prescriptions at all); (4) for unnecessary DME provided pursuant to a predetermined treatment protocol; and (5) at grossly extreme charges.

583. The Defendants knew that the extent and fact of the DME and services would be used to inflate and bolster personal injury claims submitted to Allstate on behalf of the claimants.

584. The objective of the scheme to defraud Allstate was to collect insurance benefits that the Defendants were not entitled since the DME and services rendered, if at all, were not necessary and because the Defendants engaged in fraudulent billing practices.

585. This objective necessarily required the submission of claims to Allstate.

586. The Defendants created, prepared, and submitted false documentation and placed in a post office and/or authorized depository for mail documents to be sent and delivered by the United States Postal Service.

587. Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, HCPCS code sheets, referrals, prescriptions, patient checklists, letters and request for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

588. Every automobile insurance claim detailed herein involved at least two uses of the U.S. Mail, including the mailing of the notice of claim(s), initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

589. Allstate estimates that the scheme detailed herein generated hundreds of mailings. A table listing examples of mailings made in furtherance of this scheme is annexed hereto as **Exhibit 1.**

590. The Defendants mailed (or caused the mailing of) documents, including records and bills that materially misrepresented that the Defendants were providing and properly billing for necessary DME and services.

591. The Defendants knew, and it was reasonably foreseeable, that their documents would be mailed to Allstate through the U.S. Mail in support of claims made on their patients' behalf, including the representative mailings detailed in **Exhibit 1** annexed hereto.

592. It was within the ordinary course of business for the Defendants to submit claims for reimbursement to insurance carriers like Allstate through the U.S. Mail.

593. As the Defendants agreed that GUO, Summerlin, Flexus, and Eastern would use (and did in fact use) the mail system in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Allstate policies and state law (Illinois, Wisconsin, and Indiana), the Defendants committed mail fraud, as defined in 18 U.S.C. § 1341. A table detailing representative examples of the mail fraud agreed to and perpetrated by these Defendants is annexed hereto as **Exhibit 1** and includes specific information regarding the date, the sender, the recipient, and the content of the Defendants' fraudulent mailings.

594. The representative mailings identified in **Exhibit 1** contain misrepresentations of fact regarding the necessity and fact of the DME and services for which Allstate was billed.

595. Allstate reasonably relied on the submissions it received by, and/or on behalf of, and/or with the knowledge of the Defendants through the U.S. Mail in tendering payment to the Defendants, including those payments detailed in **Exhibit 1**.

596. The Defendants' fraudulent scheme went undetected until Allstate had sustained substantial financial injury. The Defendants' fraudulent scheme was self-concealing by its very nature—false medical records and false invoices appearing legitimate on their face.

597. As the Defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## VIII. DAMAGES

598. The Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of federal and state law.

599. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, Allstate's present injury includes, but is not limited to, compensatory damages for payments made directly to GUO, Summerlin, Flexus, and Eastern in connection with medical expense claims and bodily injury claims totaling approximately **$564,613,93** (the exact amount to be determined at trial). The chart annexed hereto as **Exhibit 2**, and incorporated herein, identifies Allstate's payments made in connection with claims submitted by GUO, Summerlin, Flexus, and Eastern that are fraudulent.

## XI.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### G&U ORTHOPEDIC, LLC ENTERPRISE
### (Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, Summerlin Medical L.L.C., Flexus Medical LLC, and Eastern DME, Inc.)

600.    Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

601.    GUO constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

602.    Allstate is a "person" as defined by 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

603.    In furtherance of their operation and management of GUO, Urbina, Greenspan, Joanny, Gonzalez, Summerlin, Flexus, and Eastern (collectively, the "Count I Defendants") intentionally prepared and mailed, or caused to be prepared and mailed, false claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

604.    The Count I Defendants employed two (2) or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at **Exhibit 1**.

-82-

605.    Among other things, the Count I Defendants sent documents, notes, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

606.    Policies of insurance and DME products were delivered to Allstate Claimants through the U.S. Mail.

607.    Payments made by Allstate to GUO were delivered through the U.S. Mail.

608.    As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate related to the DME supplies and services provided by GUO for collecting payment from Allstate under the medical expense and bodily-injury benefits portion of the Allstate policies and applicable Illinois and Wisconsin laws.

609.    In reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representation, Allstate, by its agents and employees, issued drafts to GUO for the benefit of the Count I Defendants that would not otherwise have been paid.

610.    The Count I Defendants' pattern of preparing and mailing, or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count I Defendants to continue perpetrating this scheme without being detected.

611.    The facts set forth above constitute indictable offense pursuant to 18 U.S.C. § 1341 (mail fraud).

612.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to GUO for the benefit of the Count I Defendants.

613.     Allstate is in the business of writing insurance and paying claims in the State of Illinois.  Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

614.     The Count I Defendants associated with the foregoing enterprise and participated– both directly and indirectly–in the conduct of this enterprise through a pattern of racketeering activities.

615.     By means of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### G&U ORTHOPEDIC, LLC ENTERPRISE
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, Summerlin Medical L.L.C., Flexus Medical LLC, and Eastern DME, Inc.)**

616.     Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

617.     Through their participation in the operating and management of GUO, Urbina, Greenspan, Joanny, Gonzalez, Summerlin, Flexus, and Eastern (collectively, the "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

618.     The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of GUO by means of a pattern of racketeering

activity, including numerous acts of mail fraud as set forth in **Exhibit 1**, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

619.     The purpose of the conspiracy was to obtain payments from Allstate on behalf of GUO, even though GUO, because of the Count II Defendants' unlawful conduct, was not eligible to collect such payments.

620.     The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation of insurance claim documents containing material misrepresentations and/or material omissions.

621.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as result of the Defendants' unlawful conduct described herein.

622.     By violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SUMMERLIN MEDICAL L.L.C. ENTERPRISE
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Flexus Medical LLC, and Eastern DME, Inc.)**

623.     Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

624.     Summerlin constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

625.     In furtherance of their operation and management of Summerlin, Urbina, Greenspan, Joanny, Gonzalez, GUO, Flexus, and Eastern (collectively, the "Count III Defendants") intentionally prepared and mailed, or caused to be prepared and mailed, false claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

626.     The Count III Defendants employed two (2) or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at **Exhibit 1**. Among other things, the Count III Defendants sent documents, notes, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

627.     Policies of insurance and DME products were delivered to Allstate Claimants through the U.S. Mail.

628.     Payments made by Allstate to Summerlin were delivered through the U.S. Mail.

629.     As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate related to the DME supplies and services provided by Summerlin for collecting payment from Allstate under the medical expense and bodily injury benefits portion of the Allstate policies and applicable Illinois laws.

630.     In reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representation, Allstate, by its agents and employees, issued drafts to Summerlin for the benefit of the Count III Defendants that would not otherwise have been paid.

631.     The Count III Defendants' pattern of preparing and mailing, or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count III Defendants to continue perpetrating this scheme without being detected.

632.     The facts set forth above constitute indictable offense pursuant to 18 U.S.C. § 1341 (mail fraud).

633.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Summerlin for the benefit of the Count III Defendants.

634.     Allstate is in the business of writing insurance and paying claims in the State of Illinois.  Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

635.     The Count III Defendants associated with the foregoing enterprise, and participated–both directly and indirectly–in the conduct of this enterprise through a pattern of racketeering activities.

636.     By means of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

<u>COUNT IV</u>
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SUMMERLIN MEDICAL L.L.C. ENTERPRISE**
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, G&U**
**Orthopedic, LLC, Flexus Medical LLC, and Eastern DME, Inc.)**

637.    Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

638.    Through their participation in the operating and management of Summerlin, Urbina, Greenspan, Joanny, and Gonzalez, GUO, Flexus, and Eastern (collectively, the "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

639.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Summerlin by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in **Exhibit 1**, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

640.    The purpose of the conspiracy was to obtain payments from Allstate on behalf of Summerlin, even though Summerlin, because of the Count IV Defendants' unlawful conduct, was not eligible to collect such payments.

641.    The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation of insurance claim documents containing material misrepresentations and/or material omissions.

642.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as result of the Defendants' unlawful conduct described herein.

643.     By violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**FLEXUS MEDICAL LLC ENTERPRISE**
**(Against Gustavo Urbina, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC,**
**Summerlin Medical L.L.C., and Eastern DME, Inc.)**

644.     Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

645.     Flexus constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

646.     In furtherance of their operation and management of Flexus, Urbina, Joanny, Gonzalez, GUO, Summerlin, and Eastern (collectively, the "Count V Defendants") intentionally prepared and mailed, or caused to be prepared and mailed, false claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

647.     The Count V Defendants employed two (2) or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 1.

648.    Among other things, the Count V Defendants sent documents, notes, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

649.    Policies of insurance and DME products were delivered to Allstate Claimants through the U.S. Mail.

650.    Payments made by Allstate to Flexus were delivered through the U.S. Mail.

651.    As documented above, the Count V Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate related to the DME supplies and services provided by Flexus for collecting payment from Allstate under the medical expense and bodily injury benefits portion of the Allstate policies and applicable Illinois laws.

652.    Because of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representation, Allstate, by its agents and employees, issued drafts to Flexus for the benefit of the Count V Defendants that would not otherwise have been paid.

653.    The Count V Defendants' pattern of preparing and mailing, or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count V Defendants to continue perpetrating this scheme without being detected.

654.    The facts set forth above constitute indictable offense pursuant to 18 U.S.C. § 1341 (mail fraud).

655. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Flexus for the benefit of the Count V Defendants.

656. Allstate is in the business of writing insurance and paying claims in the State of Illinois. Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

657. The Count V Defendants associated with the foregoing enterprise, and participated–both directly and indirectly–in the conduct of this enterprise through a pattern of racketeering activities.

658. By means of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### FLEXUS MEDICAL LLC ENTERPRISE
**(Against Gustavo Urbina, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Eastern DME, Inc.)**

659. Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

660. Through their participation in the operating and management of Flexus, Urbina, Joanny, Gonzalez, GUO, Summerlin, and Eastern (collectively, the "Count VI Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

661. The Count VI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Flexus by means of a pattern of racketeering

activity, including numerous acts of mail fraud as set forth in **Exhibit 1**, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

662.    The purpose of the conspiracy was to obtain payments from Allstate on behalf of Flexus, even though Flexus, because of the Count VI Defendants' unlawful conduct, was not eligible to collect such payments.

663.    The Count VI Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation of insurance claim documents containing material misrepresentations and/or material omissions.

664.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as result of the Defendants' unlawful conduct described herein.

665.    By violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### EASTERN DME, INC. ENTERPRISE
**(Against Gustavo Urbina, Joanny Urbina, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Flexus Medical LLC)**

666.    Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

667.     Eastern constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

668.     In furtherance of their operation and management of Eastern, Urbina, Joanny, GUO, Summerlin, and Flexus (collectively, the "Count VII Defendants") intentionally prepared and mailed, or caused to be prepared and mailed, false claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

669.     The Count VII Defendants employed two (2) or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at **Exhibit 1**.

670.     Among other things, the Count VII Defendants sent documents, notes, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

671.     Policies of insurance and DME products were delivered to Allstate Claimants through the U.S. Mail.

672.     Payments made by Allstate to Eastern were delivered through the U.S. Mail.

673.     As documented above, the Count VII Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate related to the DME supplies and services provided by Eastern for collecting payment from Allstate under the medical expense and bodily injury benefits portion of the Allstate policies and applicable Wisconsin laws.

674.     Because of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representation, Allstate, by its agents and employees,

issued drafts to Eastern for the benefit of the Count VII Defendants that would not otherwise have been paid.

675.    The Count VII Defendants' pattern of preparing and mailing, or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count VII Defendants to continue perpetrating this scheme without being detected.

676.    The facts set forth above constitute indictable offense pursuant to 18 U.S.C. § 1341 (mail fraud).

677.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Eastern for the benefit of the Count VII Defendants.

678.    Allstate is in the business of writing insurance and paying claims in the State of Wisconsin.  Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

679.    The Count VII Defendants associated with the foregoing enterprise, and participated–both directly and indirectly–in the conduct of this enterprise through a pattern of racketeering activities.

680.    By means of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT VIII**

**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**EASTERN DME, INC. ENTERPRISE**
**(Against Gustavo Urbina, Joanny Urbina, G&U Orthopedic, LLC, Summerlin Medical**
**L.L.C., and Flexus Medical LLC)**

681.     Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

682.     Through their participation in the operating and management of Eastern, Urbina, Joanny, GUO, Summerlin, and Flexus (collectively, the "Count VIII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

683.     The Count VIII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Eastern by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in **Exhibit 1**, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

684.     The purpose of the conspiracy was to obtain payments from Allstate on behalf of Eastern, even though Eastern, because of the Count VIII Defendants' unlawful conduct, was not eligible to collect such payments.

685.     The Count VIII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation of insurance claim documents containing material misrepresentations and/or material omissions.

686.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as result of the Defendants' unlawful conduct described herein.

687. By violation of 18 U.S.C. § 1962(d), the Count VIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT IX**
**VIOLATION OF 720 ILCS 5/17-10.5**
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Flexus Medical LLC)**

688. Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

689. Urbina, Greenspan, Joanny, Gonzalez, GUO, Summerlin, and Flexus (collectively, the "Count IX Defendants") violated 720 ILCS 5/17-10.5 by, among other things, (a) billing for DME and related services that were provided in violation of applicable regulatory and licensing requirements; (b) billing for medically unnecessary DME and related services; (c) billing for DME and related services that were never provided; (d) falsely representing that its employees were rendering DME services to Allstate claimants; and (e) billing for DME and related services despite knowing that the DME and services were not lawfully reimbursable under Illinois law.

690. The Count IX Defendants' scheme to defraud Allstate included a succession of misrepresentations and omissions of material fact related to GUO, Summerlin and Flexus' eligibility for and entitlement to reimbursement under Illinois law.

691. The Count IX Defendants' misrepresentations and omissions of material fact were conveyed through statements made in GUO, Summerlin and Flexus' records, documents, notes,

reports, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment.

692.     The Count IX Defendants' statements and representations were false, or they at least required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

693.     The Count IX Defendants knew that Allstate would rely on GUO, Summerlin, and Flexus' documents when deciding to pay claims so they purposely and intentionally misrepresented or omitted material facts to induce Allstate into making payment on the claims.

694.     Allstate reasonably relied, to its detriment, upon the Count IX Defendants' misrepresentations and omissions of material fact concerning the patients' injuries, the necessity of the DME and services that were billed for, and GUO, Summerlin, and Flexus' right to be paid.

695.     Allstate's damages include, but are not necessarily limited to, (a) the total amount actually paid by Allstate in connection with the Count IX Defendants' false claims (subject to mandatory trebling), and/or (b) the total amount that the Count IX Defendants sought or attempted to collect from Allstate in cases where no payment was made (subject to mandatory doubling).

## COUNT X
## VIOLATION OF 815 ILCS 505/2
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Flexus Medical LLC)**

696.     Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

697.     Urbina, Greenspan, Joanny, Gonzalez, GUO, Summerlin, and Flexus (collectively, the "Count X Defendants") engaged in trade and commerce, and violated 815 ILCS 505/2 by,

among other things, (a) falsely operating unlicensed DME companies, Summerlin and Flexus in violation of the applicable regulatory and licensing requirements, and then misrepresenting that these companies were licensed when they were not; (b) automatically shipping and billing for DME replenishment supplies and related services that were not ordered by Allstate, the claimants, or the prescribing providers; and (c) falsely representing and falsely charging for DME and related services that were not provided to Allstate claimants with the knowledge that such DME and services were not lawfully reimbursable under Illinois' laws.

698.    The Count X Defendants made their material misrepresentations while they were engaged in business activities unrelated to medical decision-making, DME and services.

699.    The Count X Defendants' scheme to defraud Allstate was dependent upon a succession of misrepresentations and omissions of material fact related to GUO, Summerlin, and Flexus' eligibility for and entitlement to reimbursement under Illinois law.

700.    The Count X Defendants' misrepresentations and omissions of material fact were conveyed through statements made in GUO, Summerlin and Flexus' records, documents, notes, reports, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment.

701.    The Count X Defendants' statements and representations were false, or they at least required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

702.    The Count X Defendants knew that Allstate would rely on GUO, Summerlin and Flexus' documents when deciding to pay claims, so they purposely and intentionally misrepresented or omitted material facts to induce Allstate into making payment on the claims.

703.     Allstate's damages include, but are not necessarily limited to, (a) the total amount actually paid by Allstate in connection with the Count X Defendants' false claims (**$564,913.93**); (b) punitive damages; and (c) costs, expenses, and reasonable attorney's fees.

**COUNT XI**
**ILLINOIS COMMON LAW FRAUD**
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Flexus Medical LLC)**

704.     Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

705.     Urbina, Greenspan, Joanny, Gonzalez, GUO, Summerlin, and Flexus (collectively, the "Count XI Defendants") committed fraud by, among other things, (a) falsely operating unlicensed DME companies, Summerlin (for years) and Flexus (for months) in violation of the applicable regulatory and licensing requirements, and then misrepresenting that these companies were licensed when they were not; (b) automatically shipping and billing for DME replenishment supplies and related services that were not ordered by Allstate, the claimants, or the prescribing providers; and (c) falsely representing and falsely charging for DME and related services that were not provided as represented in records and bills and that were never provided or rendered at all to the Allstate claimants with the knowledge that such DME and services were not lawfully reimbursable under Illinois' laws.

706.     The Count XI Defendants' scheme to defraud Allstate was dependent upon a succession of misrepresentations and omissions of material fact related to GUO, Summerlin, and Eastern's eligibility for and entitlement to reimbursement under Illinois law.

707.    The Count XI Defendants' misrepresentations and omissions of material fact were conveyed through statements made in GUO, Summerlin and Flexus records, documents, notes, reports, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment.

708.    The Count XI Defendants' statements and representations were false, or they at least required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

709.    The Count XI Defendants knew that Allstate would rely on GUO, Summerlin, and Flexus' documents when deciding to pay claims, so they purposely and intentionally misrepresented or omitted material facts to induce Allstate into making payment on the claims.

710.    Allstate's damages include, but are not necessarily limited to, the total amount actually paid by Allstate in connection with the Count XI Defendants' false claims (**$564,613.93**).

**COUNT XII**
**ILLINOIS UNJUST ENRICHMENT**
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Flexus Medical LLC)**

711.    Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

712.    Urbina, Greenspan, Joanny, Gonzalez, GUO, Summerlin, and Flexus (collectively, the "Count XII Defendants") were unjustly enriched by (a) falsely operating unlicensed DME companies, Summerlin (for years) and Flexus (for months) in violation of the applicable regulatory and licensing requirements, and then misrepresenting that these companies were licensed when they were not; (b) automatically shipping and billing for DME replenishment supplies and DME

services that were not ordered by Allstate, the claimants, or the prescribing providers; and (c) falsely representing and falsely charging for DME and related services that were not provided as represented in records and bills and that were never provided or rendered at all to the Allstate claimants with the knowledge that such DME supplies and services were not lawfully reimbursable under Illinois' laws.

713. The Count XII Defendants' scheme to defraud Allstate was dependent upon a succession of misrepresentations and omissions of material fact related to GUO, Summerlin, and Eastern's eligibility for and entitlement to reimbursement under Illinois law.

714. The Count XII Defendants' misrepresentations and omissions of material fact were conveyed through statements made in GUO, Summerlin, and Flexus' records, documents, notes, reports, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment.

715. The Count XII Defendants' statements and representations were false, or they at least required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

716. The Count XII Defendants knew that Allstate would rely on GUO, Summerlin, and Flexus' documents when deciding to pay claims, so they purposely and intentionally misrepresented or omitted material facts to induce Allstate into making payment on the claims.

717. When Allstate paid GUO, Summerlin, and Flexus directly, or when Allstate paid a third-party bodily injury claim that was supported by billing submitted by GUO, Summerlin, and Flexus, Allstate reasonably believed that it was legally obligated to make payments on these claims

based on the representations made in the records and bills created and submitted by (or on behalf of) GUO, Summerlin, or Flexus.

718.    Each and every payment that Allstate was caused to make to (or for the benefit of) GUO, Summerlin, and Flexus during the course of the scheme constitutes a benefit that the Count XII Defendants aggressively sought and voluntarily accepted.

719.    The Count XII Defendants caused GUO, Summerlin, and Flexus to wrongfully obtain a multitude of payments from Allstate as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.  Allstate's injury is the direct and proximate result of the Defendants' unlawful conduct.

720.    The Count XII Defendants obtained substantial monetary benefits as the result of their unlawful conduct during the course of this scheme—benefits that were derived, in part, directly from the monies that Allstate was wrongfully induced to pay on the insurance claims at issue in this Complaint.

721.    Retention of those benefits by any of the Count XII Defendants would violate fundamental principles of justice, equity, and good conscience.

### COUNT XIII
### VIOLATION OF WIS. STAT. § 946.83(1), (2), and (3)
### WISCONSIN ORGANIZED CRIME CONTROL ACT (WOCCA)
### (Against Gustavo Urbina and Joanny Urbina)

722.    Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

723.    Eastern constitutes an enterprise pursuant to Wis. Stat. § 946.82(2).

724.     Under the Wisconsin Organized Control Act, racketeering activity includes "any specified in 18 U.S.C. §1961(1)" plus the attempt to violate Wisconsin state law § 943.89(1)-(3) – Mail Fraud. *See* Wis. Stat. § 946.82(4).

725.     In furtherance of their operation and management of Eastern, Urbina, and Joanny (collectively, the "Count XIII Defendants") intentionally prepared and mailed, or caused to be prepared and mailed, false claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

726.     The Count XIII Defendants employed two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at **Exhibit 1.**

727.     Among other things, the Count XIII Defendants sent documents, notes, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

728.     Policies of insurance and DME products were delivered to Allstate claimants through the U.S. Mail.

729.     Payments made by Allstate to Eastern were delivered through the U.S. Mail.

730.     As documented above, the Count XIII Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate related to the DME supplies and services provided by Eastern for collecting payment from Allstate under the medical expense and bodily injury benefits portion of the Allstate policies and applicable Wisconsin laws.

731.     Because of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representation, Allstate, by its agents and employees,

issued drafts to Eastern for the benefit of Urbina and Joanny that would not otherwise have been paid.

732.    Urbina and Joanny received these payments with the knowledge that the proceeds were derived from a pattern of racketeering activity.

733.    Urbina and Joanny subsequently used or invested these proceeds in the establishment of the Eastern enterprise by sharing, receiving, and transferring assets to GUO, Summerlin, and Flexus.

734.    The Count XIII Defendants' pattern of preparing and mailing, or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count XIII Defendants to continue perpetrating this scheme without being detected.

735.    The first and latest known incident perpetrated by the Count XIII Defendants occurred within seven years of each other.

736.    As a direct and proximate result of the Count XIII Defendants' pattern of racketeering activity, Allstate suffered damages pursuant to Wis. Stat. § 946.87(4).

737.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Eastern for the benefit of the Count XIII Defendants.

738.    Allstate is in the business of writing insurance and paying claims in the State of Wisconsin.  Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

739.    The Count XIII Defendants associated with the foregoing enterprise, and participated–both directly and indirectly–in the conduct of this enterprise through a pattern of racketeering activities.

740.    By means of the Count XIII Defendants' violations of 18 U.S.C. § 1962(c), and Wis. Stat. § 943.89(1)-(3), Allstate is entitled to recover two (2) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, punitive damages, together with the costs of suit, including reasonable attorneys' fees.

<strong><u>COUNT XIV</u></strong><br><strong>VIOLATION OF WIS. STAT. § 943.395 PURSUANT TO WIS. STAT. §895.446.1)</strong><br><strong>(Against Gustavo Urbina, Joanny Urbina, and Eastern DME, Inc.)</strong>

741.    Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

742.    Pursuant to Wis. Stat. §895.446.1, any person who suffers damage or loss by reason of intentional conduct pursuant to Wis. Stat. § 943.395 has a cause of action against the person or person who caused the damage or loss.

743.    Wis. Stat. § 943.395 penalizes the act of submitting fraudulent insurance claims.

744.    Urbina, Joanny, and Eastern (collectively, the "Count XIV Defendants") violated Wis. Stat. § 943.395 by, among other things, (a) billing for DME and related services that were provided in violation of applicable regulatory and licensing requirements; (b) billing for medically unnecessary DME and related services; (c) billing for DME and related services that were never provided; (d) falsely representing that its employees were rendering DME services to Allstate claimants; and (e) billing for DME and related services despite knowing that the DME and services were not lawfully reimbursable under Wisconsin law.

745.     The Count XIV Defendants' scheme to defraud Allstate included a succession of misrepresentations and omissions of material fact related to Eastern's eligibility for and entitlement to reimbursement under Wisconsin law.

746.     The Count XIV Defendants' misrepresentations and omissions of material fact were conveyed through statements made in Eastern's records, documents, notes, reports, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment.

747.     The Count XIV Defendants' statements and representations were false, or they at least required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

748.     The Count XIV Defendants knew that Allstate would rely on Eastern's documents when deciding to pay claims so they purposely and intentionally misrepresented or omitted material facts to induce Allstate into making payment on the claims.

749.     Allstate reasonably relied, to its detriment, upon the Count XIV Defendants' misrepresentations and omissions of material fact concerning the patients' injuries, the necessity of the tests, DME and services that were billed for, and Eastern's right to be paid.

**COUNT XV**
**WISCONSIN COMMON LAW FRAUD**
**(Against Gustavo Urbina, Joanny Urbina, and Eastern DME, Inc.)**

750.     Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

751.     Urbina, Joanny, and Eastern (collectively, the "Count XV Defendants") engaged in fraud by (a) falsely operating an unlicensed DME company, Eastern in violation of the applicable

regulatory and licensing requirements, and then misrepresenting that Eastern was licensed when it was not; (b) automatically shipping and billing for DME replenishment supplies and DME services that were not ordered by Allstate, the claimants, or the prescribing providers; and (c) falsely representing and falsely charging for DME and related services that were not provided as represented in records and bills and that were never provided or rendered at all to the Allstate claimants with the knowledge that such DME and services were not lawfully reimbursable under Wisconsin's laws.

752.    The Count XV Defendants made their material misrepresentations while they were engaged in business activities unrelated to medical decision-making and DME and services.

753.    The Count XV Defendants' scheme to defraud Allstate was dependent upon a succession of misrepresentations and omissions of material fact related to Eastern's eligibility for and entitlement to reimbursement under Wisconsin law.

754.    The Count XV Defendants' misrepresentations and omissions of material fact were conveyed through statements made in Eastern's records, documents, notes, reports, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment.

755.    The Count XV Defendants' statements and representations were false, or they at least required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

756.    The Count XV Defendants knew that Allstate would rely on Eastern's documents when deciding to pay claims, so they purposely and intentionally misrepresented or omitted material facts to induce Allstate into making payment on the claims.

757.     Allstate's damages include, but are not necessarily limited to, (a) the total amount actually paid by Allstate in connection with the Count XV Defendants' false claims ($564,613.93); (b) punitive damages; and (c) costs, expenses, and reasonable attorney's fees.

**COUNT XVI**
**WISCONSIN UNJUST ENRICHMENT**
**(Against Gustavo Urbina, Joanny Urbina, and Eastern DME, Inc.)**

758.     Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

759.     Urbina, Joanny, and Eastern (collectively, the "Count XVI Defendants") were unjustly enriched by (a) falsely operating an unlicensed DME company in violation of the applicable regulatory and licensing requirements, and then misrepresenting that these companies were licensed when they were not; (b) automatically shipping and billing for DME replenishment supplies and DME services that were not ordered by Allstate, the claimants, or the prescribing providers; and (c) falsely representing and falsely charging for DME and related services that were not provided as represented in records and bills and that were never provided or rendered at all to the Allstate claimants with the knowledge that such DME and services were not lawfully reimbursable under Wisconsin's laws.

760.     The Count XVI Defendants made their material misrepresentations while they were engaged in business activities unrelated to medical decision-making and DME and services.

761.     The Count XVI Defendants' scheme to defraud Allstate was dependent upon a succession of misrepresentations and omissions of material fact related to Eastern's eligibility for and entitlement to reimbursement under Wisconsin law.

762.    The Count XVI Defendants' misrepresentations and omissions of material fact were conveyed through statements made in Eastern's records, documents, notes, reports, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment.

763.    The Count XVI Defendants' statements and representations were false, or they at least required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

764.    The Count XVI Defendants knew that Allstate would rely on Eastern's documents when deciding to pay claims, so they purposely and intentionally misrepresented or omitted material facts to induce Allstate into making payment on the claims.

765.    When Allstate paid Eastern directly, or when Allstate paid a third-party bodily injury claim that was supported by billing submitted by Eastern, Allstate reasonably believed that it was legally obligated to make payments on these claims based on the representations made in the records and bills created and submitted by (or on behalf of) Eastern.

766.    Each and every payment that Allstate was caused to make to (or for the benefit of) Eastern during the course of this scheme constitutes a benefit that the Count XVI Defendants aggressively sought and voluntarily accepted.

767.    The Count XVI Defendants caused Eastern to wrongfully obtain a multitude of payments from Allstate as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.  Allstate's injury is the direct and proximate result of the Defendants' unlawful conduct.

768.    The Count XVI Defendants obtained substantial monetary benefits as the result of their unlawful conduct during the course of this scheme—benefits that were derived, in part, directly from the monies that Allstate was wrongfully induced to pay on the insurance claims at issue in this Complaint.

769.    Retention of those benefits by any of the Count XVI Defendants would violate fundamental principles of justice, equity, and good conscience.

<u>**COUNT XVII**</u>
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against G&U Orthopedic, LLC, Summerlin Medical L.L.C., Flexus Medical LLC, and Eastern DME, Inc.)**

770.    Allstate repeats and restates the allegations set forth above in ¶¶ 1-599 as if set forth fully in this section.

771.    In view of its (a) billing for services that were not rendered, (b) billing for services that were not rendered as represented, and (c) billing for services that were not medically necessary and completely unjustified as a means of treating the Allstate claimants' purported injuries, GUO, Summerlin, Flexus, and Eastern were, at all times relevant, completely ineligible for reimbursement under Illinois and Wisconsin law, and thus have no standing to submit or receive insurance benefits from Allstate, and thus have no standing to submit or receive insurance benefits from Allstate.

772.    Flexus and Eastern continue to submit, or continue to cause to be submitted, claims to Allstate demanding payment, and other claims remain pending with Allstate.

773.    GUO and Summerlin continue demanding payment for claims that remain pending with Allstate.

774. GUO, Summerlin, Flexus and Eastern continue to challenge Allstate's prior claim denials.

775. A justifiable controversy exists between Allstate and GUO, Summerlin, Flexus, and Eastern because they reject Allstate's ability to deny such claims.

776. Allstate has no adequate remedy at law.

777. Flexus and Eastern also will continue to bill Allstate for absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future claims submitted by GUO, Summerlin, Flexus, and Eastern.

778. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring (a) that GUO, Summerlin, Flexus, and Eastern have no standing to seek, collect, or retain any payments made by Allstate, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, GUO, Summerlin, Flexus, and Eastern.

## XII.  DEMAND FOR RELIEF

WHEREFORE, Allstate respectfully prays that judgment be entered in its favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**G&U ORTHOPEDIC, LLC ENTERPRISE**
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, Summerlin Medical L.L.C., Flexus Medical LLC, and Eastern DME, Inc.)**

(i)     AWARD Allstate's actual and consequential damages to be established at trial;

(ii)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)   GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

### COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### G&U ORTHOPEDIC, LLC ENTERPRISE
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, Summerlin Medical L.L.C., Flexus Medical LLC, and Eastern DME, Inc.)**

(i)     AWARD Allstate's actual and consequential damages to be established at trial;

(ii)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)   GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

### COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SUMMERLIN MEDICAL L.L.C. ENTERPRISE
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Flexus Medical LLC, and Eastern DME, Inc.)**

(i)     AWARD Allstate's actual and consequential damages to be established at trial;

(ii)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count III Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

<u>**COUNT IV**</u>
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SUMMERLIN MEDICAL L.L.C. ENTERPRISE**
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Flexus Medical LLC, and Eastern DME, Inc.)**

(i)     AWARD Allstate's actual and consequential damages to be established at trial;

(ii)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

<u>**COUNT V**</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**FLEXUS MEDICAL LLC ENTERPRISE**
**(Against Gustavo Urbina, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Eastern DME, Inc.)**

(i)     AWARD Allstate's actual and consequential damages to be established at trial;

(ii)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count V Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### FLEXUS MEDICAL LLC ENTERPRISE
**(Against Gustavo Urbina, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Eastern DME, Inc.)**

(i)      AWARD Allstate's actual and consequential damages to be established at trial;

(ii)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count VI Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### EASTERN DME, INC. ENTERPRISE
**(Against Gustavo Urbina, Joanny Urbina, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Flexus Medical LLC)**

(i)      AWARD Allstate's actual and consequential damages to be established at trial;

(ii)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count VII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### EASTERN DME, INC. ENTERPRISE
**(Against Gustavo Urbina, Joanny Urbina, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Flexus Medical LLC)**

(i)    AWARD Allstate's actual and consequential damages to be established at trial;

(ii)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count VIII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

## COUNT IX
### VIOLATION OF 720 ILCS 5/17-10.5
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Flexus Medical LLC)**

(i)    AWARD Allstate's actual damages in amount to be determined at trial;

(ii)    AWARD Allstate double or treble damages and its attorneys' fees pursuant to 720 ILCS 5/17-10.5(e)(1); and

(iii)    GRANT all other relief this Court deems just and proper.

## COUNT X
### VIOLATION OF 815 ILCS 505/2

**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Flexus Medical LLC)**

(i)      AWARD Allstate's actual damages in amount to be determined at trial;

(ii)     AWARD Allstate costs and attorneys' fees pursuant to 815 ILCS 505/210a; and

(iii)    GRANT all other relief this Court deems just and proper.

## COUNT XI
### ILLINOIS COMMON LAW FRAUD
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Flexus Medical LLC)**

(i)      AWARD Allstate's actual damages in an amount to be determined at trial;

(ii)     AWARD Allstate its costs, including, but not limited to, investigative costs,

incurred in the detection of the Defendants' illegal conduct; and

(iii)    GRANT any other relief this Court deems just and proper.

## COUNT XII
### ILLINOIS UNJUST ENRICHMENT
**(Against Gustavo Urbina, Stacie Greenspan, Joanny Urbina, Merle Gonzalez, G&U Orthopedic, LLC, Summerlin Medical L.L.C., and Flexus Medical LLC)**

(i)      AWARD Allstate's actual and consequential damages in an amount to be

determined at trial; and

(ii)     GRANT any other relief this Court deems just and proper.

## COUNT XIII
### VIOLATION OF WIS. STAT. § 946.83(1), (2), and (3)
### WISCONSIN ORGANIZED CRIME CONTROL ACT (WOCCA)
**(Against Gustavo Urbina and Joanny Urbina)**

(i)      AWARD Allstate's actual and consequential damages to be established at trial;

(ii)     AWARD Allstate double damages, interests, costs, and attorneys' fees; and

(iii)    GRANT injunctive relief enjoining the Count XIII Defendants from engaging in the wrongful conduct alleged in the Complaint.

## COUNT XIV
**VIOLATION OF WIS. STAT. § 943.395 PURSUANT TO WIS. STAT. §895.446.1)**
**(Against Gustavo Urbina, Joanny Urbina, and Eastern DME, Inc.)**

(i)    AWARD Allstate's actual and consequential damages in an amount to be determined at trial; and

(ii)    GRANT any other relief this Court deems just and proper.

## COUNT XV
**WISCONSIN COMMON LAW FRAUD**
**(Against Gustavo Urbina, Joanny Urbina, and Eastern DME, Inc.)**

(i)    AWARD Allstate's actual and consequential damages in an amount to be determined at trial; and

(ii)    GRANT any other relief this Court deems just and proper.

## COUNT XVI
**WISCONSIN UNJUST ENRICHMENT**
**(Against Gustavo Urbina, Joanny Urbina, and Eastern DME, Inc.)**

(i)    AWARD Allstate's actual and consequential damages in an amount to be determined at trial; and

(ii)    GRANT any other relief this Court deems just and proper.

## COUNT XVII
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against G&U Orthopedic, LLC, Summerlin Medical L.L.C., Flexus Medical LLC, and Eastern DME, Inc.)**

(i)     DECLARE that G&U Orthopedic, LLC, Summerlin Medical L.L.C., Flexus Medical LLC, and Eastern DME, Inc. billed for medical DME services that were provided in violation of Illinois law and Wisconsin law;

(ii)     DECLARE that G&U Orthopedic, LLC, Summerlin Medical L.L.C., Flexus Medical LLC, and Eastern DME, Inc. charges for DME and services that are unlawful;

(iii)     DECLARE that Allstate has no obligation to pay any pending, previously denied, and/or future claims submitted by G&U Orthopedic, LLC, Summerlin Medical L.L.C., Flexus Medical LLC, and Eastern DME, Inc. for such DME and services; and

(iv)     GRANT all other relief this Court deems just and proper.

## **JURY DEMAND**

Allstate hereby demands a trial by jury on all issues claims so triable whether in this pleading or any amended pleading.

[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Douglas D. McInnis*

_____
Douglas D. McInnis
dmcinnis@ktmpc.com
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Vehicle and Property Insurance Company*

Dated: August 1, 2024